UNITED STATES, Appellee

v.

Kimberly L. COLLIER,
Aviation Machinist's Mate Third Class
U.S. Navy, Appellant

No. 08-0495

Crim. App. No. 200601218

United States Court of Appeals for the Armed Forces

Argued December 17, 2008

Decided May 18, 2009

RYAN, J., delivered the opinion of the Court, in which EFFRON,
C.J., and ERDMANN and STUCKY, JJ. joined.  BAKER, J., filed a
separate dissenting opinion.

Counsel

For Appellant:  Captain Kyle Kilian, USMC (argued); Lieutenant
W. Scott Stoebner, JAGC, USN (on brief).

For Appellee:  Colonel Louis J. Puleo, USMC (argued); Brian K.
Keller, Esq. (on brief).

Military Judges:  Michael J. Catanese, Daniel E. O'Toole, and
Christopher D. Connor

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge RYAN delivered the opinion of the Court.

This case presents the question whether the military judge erred in granting the Government's motion in limine prohibiting Appellant's defense counsel from cross-examining HM2 C, the main Government witness, about an alleged homosexual romantic relationship between her and Appellant and from introducing any evidence of such a relationship.[1]  While the military judge did permit cross-examination about a close friendship, the defense that Appellant wanted to present was that HM2 C framed Appellant for larceny as a result of their romantic relationship ending badly.  Because of this ruling, Appellant was free only to assert the motivation of an angry friend rather than a disappointed lover; as the Government then argued in its closing, the motivation of an angry, vengeful friend "strains all logic; it's just not credible."

The military judge's ruling prevented Appellant's counsel from fully exploring HM2 C's bias and motive to misrepresent the truth, and precluded Appellant from presenting her theory of the

---

[1] Upon Appellant's petition, we granted review of the following issue:

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY EXCLUDING, PURSUANT TO M.R.E. 403, RELEVANT EVIDENCE OF A PRIOR HOMOSEXUAL RELATIONSHIP BETWEEN APPELLANT AND A CENTRAL GOVERNMENT WITNESS OFFERED BY THE DEFENSE TO SHOW BIAS AND MOTIVE TO MISREPRESENT ON THE PART OF THE GOVERNMENT WITNESS.

case.  Under the facts of this case, this was a violation of Appellant's Sixth Amendment right to confront a witness against her.  See Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . ."). Under the circumstances of this case, including the fact that in its closing argument the Government exploited the evidentiary limitation it requested to criticize the theory with which Appellant was left, we find this constitutional error was not harmless beyond a reasonable doubt.  The decision of United States Navy-Marine Corps Court of Criminal Appeals (CCA) upholding the military judge's ruling is reversed.

## I.  Facts

A special court-martial composed of members convicted Appellant, contrary to her pleas, of one specification of larceny of military property and one specification of obstructing justice by wrongfully endeavoring to influence the testimony of a witness, in violation of Articles 121 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 921, 934 (2000).  The sentence adjudged by the court-martial and approved by the convening authority included a bad-conduct discharge, confinement for six months, and reduction to the lowest enlisted

grade.  The United States Navy-Marine Corps Court of Criminal Appeals affirmed.  United States v. Collier, No. NMCCA 200601218, 2008 CCA LEXIS 53, at *29, 2008 WL 495700, at *11 (N-M. Ct. Crim. App. Feb. 21, 2008) (unpublished).

Prior to her court-martial, Appellant served as the tool custodian for Helicopter Combat Support Squadron EIGHT (HC-8) in Norfolk, Virginia.  The larceny charge in this case involves tools alleged to have been taken from this command.  Hospitalman Second Class (HM2) C testified for the Government that she found these tools in her home.  HM2 C testified that she and Appellant had been good friends and that Appellant had stayed at her home four or five nights a week.  Appellant kept some of her belongings at HM2 C's home, specifically, in HM2 C's son's bedroom.  At some point, Appellant and HM2 C had a falling out and HM2 C requested that Appellant not return to HM2 C's home. The women disagreed about how Appellant could retrieve her belongings from HM2 C, which eventually resulted in Appellant asking her command for help in obtaining several items she claimed were still at HM2 C's house, including tools, a television, and a diamond ring.  HM2 C testified that when she checked her home for these items, she first found a bag of tools in her garage, and later found more tools in a chest of drawers in her son's room.

After each discovery, HM2 C consulted with her command and then arranged for the return of the tools to Appellant's command.  There were 215 tools returned to HC-8 by HM2 C, of which approximately 65 were etched with the command code "B10" or "B1."  Among the tools returned was an etcher.  Testimony at trial established that prior to HM2 C turning them in, no one had noticed this large quantity of tools missing.  This was true even though a cursory visual check of the locker in which such tools were kept was done not long before the tools were turned in.  Testimony also established that while all of the recovered tools were among those used by HC-8, many, if not all, of them could be purchased at retail stores such as Sears.

Some time after Appellant had been charged with larceny of the tools, HM2 C encountered Appellant at a beauty salon.  HM2 C testified that at the salon, she overheard Appellant speaking on her cell phone.  According to HM2 C, while Appellant was standing close to her, Appellant said into her cell phone: "Yeah, we should get this bitch; let's get her."  When HM2 C left the salon, she found that a tire on her car had been slashed.  Appellant admitted to the civilian authorities that she had slashed the tire.  Based on this incident, Appellant was charged with one count of obstructing justice by wrongfully endeavoring to influence the testimony of a witness, under Article 134, UCMJ.

Prior to court-martial, the Government filed a motion in limine seeking to prohibit Appellant's defense counsel from cross-examining HM2 C about an alleged homosexual romantic relationship between her and Appellant and from introducing any evidence of such a relationship. The basis of the Government's motion was threefold: (1) no such relationship existed, and even if it did exist it was not relevant; (2) even if the relationship was relevant, prejudice created by statute and Navy policy prohibiting homosexual conduct would substantially outweigh the relevance; and (3) allowing this line of questioning would "serve only to embarrass and harass the witness."

At the hearing on the motion, trial counsel advanced two additional arguments. First, Appellant could show sufficient bias by inquiring into the fact that the women were no longer friends because the women had argued about HM2 C's daughter and also because HM2 C's boyfriend didn't like Appellant. Second, the factual dispute about whether the two women actually had a romantic or sexual relationship was a collateral matter that threatened to take over the proceedings and confuse the members. During the hearing trial counsel further asserted that evidence of a homosexual relationship was "too inflammatory" for the members to hear. As part of this assertion, trial counsel emphasized the homosexual nature of the relationship and linked

6

the danger of unfair prejudice to the congressional finding that "homosexuality presents an unacceptable risk to the high standards of morale, good order, and discipline in the military."  Transcript of Record at 54, United States v. Collier, No. 08-0495; 10 U.S.C. § 654(a)(14) (2000).

The defense opposed the motion, arguing that the Sixth Amendment guarantees the right to confront and cross-examine witnesses and that the limitation requested by the Government violated those rights.  Defense counsel argued that cross-examination and any related extrinsic evidence of a romantic homosexual relationship would be admissible under Military Rule of Evidence (M.R.E.) 608(c) to support a theory that HM2 C was biased against Appellant and had a motive to lie in her testimony because their relationship had ended badly.  See M.R.E. 608(c) ("Bias, prejudice, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced.").  In addition, defense counsel argued that this evidence would be relevant to show that the tire slashing was due to Appellant's anger over the breakup of their relationship, rather than done "with the intent to influence" HM2 C's testimony, as required to prove the obstructing justice charge.  Manual for Courts-Martial, United States pt. IV, para. 96b(3) (2005 ed.) (MCM).

While the Government claimed that there was no qualitative difference between a friendship and a romantic relationship for purposes of showing bias, defense counsel disagreed, arguing: "What motivates a person to do something, or how they may be biased, I think, are completely different, apples and oranges, between a friendship and a romantic relationship, whether it be homosexual or heterosexual."

After hearing argument on the motion, the military judge stated on the record that the defense had "presented sufficient evidence, for the purposes of the motion, that there was such a sexual relationship."  Transcript of Record at 75-76, Collier, No. 08-0495; see M.R.E. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence . . . shall be determined by the military judge.").  In his formal ruling on the motion, the military judge did not make a conclusive finding of fact as to whether the sexual relationship actually occurred, although he did note that during the hearing on the motion:

> [T]he defense presented the testimony of the accused that there was such a sexual relationship.  The accused also testified that their relationship lasted four months and ended just prior to the witness reporting the alleged larceny.  The accused also testified that their relationship was always sexual, until it ended on or about early March 2004.  The government presented evidence by cross-examination of the accused and by affidavit that tends to refute any sexual aspect to the relationship.

Findings and Ruling on Government Motion In Limine at 1, United States v. Collier, Special Court-Martial, Tidewater Judicial Circuit (Nov. 24, 2004). The military judge found that the "nature of the relationship has some relevance to the determination of [the bias] issue by the jury." Id. at 2. He then concluded that after "balancing this relevance with M.R.E. 403 and M.R.E. 611, the court finds that the sexual nature of this relationship is not sufficiently relevant." Id. Finally, the judge ruled:

> [T]he defense may ask, on cross-examination, if the witness would characterize the relationship as close, personal and/or emotionally close. The defense may ask her if the relationship was closer than ordinary friends. Pursuant to M.R.E. 608(c), the defense may also introduce extrinsic evidence on the nature of the relationship including testimony or documents, if otherwise admissible. However, the defense will not open the issue of any alleged sexual acts between the witness and the accused. Specifically, the defense will not ask any witness if the relationship was sexual, homosexual, intimate or romantic.

Id. (emphasis added).

The CCA found that the military judge did not abuse his discretion when he limited defense counsel's cross-examination of HM2 C. Collier, 2008 CCA LEXIS 53, at *11, 2008 WL 495700, at *4. Specifically, the CCA stated: "Reviewing the facts before the military judge at the time of his ruling, we conclude that he correctly balanced the probative value against the prejudicial impact of evidence that would have been of a

particularly inflammatory nature in a trial by court-martial."
Id. at *10, 2008 WL495700, at *4.  In support of this
conclusion, the CCA cited "'the high degree of antipathy to
homosexuality in the armed forces'" as well as the fact that
"'[a] person who engages in homosexual conduct . . . is subject
to mandatory discharge, with very limited exceptions.'"  Id.
(quoting United States v. Phillips, 52 M.J. 268, 273 (C.A.A.F.
2000) (Effron, J., dissenting)).

## II.  Discussion

### A.  The Sixth Amendment and limits on cross-examination

It is well settled that "the exposure of a witness'
motivation in testifying is a proper and important function of
the constitutionally protected right of cross-examination."
Davis v. Alaska, 415 U.S. 308, 316-17 (1974).  Through cross-
examination, an accused can "expose to the jury the facts from
which jurors . . . could appropriately draw inferences relating
to the reliability of the witness."  Id. at 318.  A limitation
on an accused's presentation of bias evidence may be a violation
of the Sixth Amendment right to confront witnesses.  The
question is whether "[a] reasonable jury might have received a
significantly different impression of [the witness's]
credibility had [defense counsel] been permitted to pursue his
proposed line of cross-examination."  Van Arsdall, 475 U.S. at
680.  The right of cross-examination is not unlimited, however;

10

the accused's confrontation right does not give, for example, free license to cross-examine a witness to such an extent as would "'hammer th[e] point home to the jury.'" United States v. James, 61 M.J. 132, 135 (C.A.A.F. 2005) (quoting United States v. Nelson, 39 F.3d 705, 708 (7th Cir. 1994)). Whether sufficient cross-examination has been permitted depends on whether the witness's motivation for testifying has already been exposed and "further inquiry . . . would [be] marginally relevant at best and potentially misleading." United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007) (finding cross-examination of coconspirator about his pretrial agreement was sufficient even though the military judge had refused to permit questions related to the term setting a maximum punishment).

In this case, the military judge's ruling prohibited all cross-examination and extrinsic evidence regarding a sexual or romantic relationship between Appellant and HM2 C. This did not allow Appellant to expose the alleged nefarious motivation behind HM2 C's allegations and testimony. The Government argues that Appellant was able to conduct sufficient cross-examination without revealing whether the relationship between the two women was a romantic one. However, it is intuitively obvious that there is a qualitative difference between the breakup of a friendship and a badly ended romantic relationship, whether that romantic relationship was sexual or not. As has long been

11

recognized, "Heav'n has no Rage, like Love to Hatred turn'd." William Congreve, The Mourning Bride 39 (Jacob Tonson 1703) (1697). We have no doubt that the romantic nature of a relationship has a "special relevance" to motivation such that allowing additional cross-examination in that area is not a mere "opportunity . . . to hammer th[e] point home to the jury." Carruthers, 64 M.J. at 344 (citation and quotation marks omitted).

Appellant claimed during her testimony on the motion in limine that her relationship with HM2 C went beyond friendship, to a sexual and romantic relationship that lasted four months, during which time she lived with HM2 C. If the members had been given evidence of a sexual and romantic relationship between HM2 C and Appellant, they might have had a significantly different impression of HM2 C's credibility. In the context of a romantic relationship turned sour, Appellant's theory of the case, in which HM2 C framed Appellant, could have been credible to the panel.

Of course, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. In this

case, the military judge acknowledged that Appellant had a Sixth Amendment right to confront HM2 C, but ruled that evidence of a sexual relationship between them was not admissible under M.R.E. 403 and M.R.E. 611, both of which reflect the concerns cited by the Supreme Court in Van Arsdall. See M.R.E. 403 (requiring a military judge to decide whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); M.R.E. 611(a) (allowing military judge to control the mode and order of interrogating witnesses, including to "protect [them] from harassment or undue embarrassment").

A military judge's ruling that bias evidence is inadmissible is reviewed for an abuse of discretion. United States v. Moss, 63 M.J. 233, 236 (C.A.A.F. 2006). For the ruling to be an abuse of discretion, it must be "more than a mere difference of opinion"; rather, it must be "'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" United States v. McElhaney, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting United States v. Miller, 46 M.J. 63, 65 (C.A.A.F. 1997); United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987)). Although "[a] military judge enjoys wide discretion in applying [M.R.E.] 403[,] . . . [t]his Court gives military judges less deference

13

if they fail to articulate their balancing analysis on the record." United States v. Manns, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations and quotation marks omitted). In this case, the military judge did not make any findings of fact or conclusions of law about the objections raised by the Government under R.C.M. 611 and M.R.E. 403; he merely recited their arguments. Because of this failure to articulate his analysis, we accord the military judge's ruling less deference and will examine the record to assess both his decision and that of the CCA. United States v. Bins, 43 M.J. 79, 85-86 (C.A.A.F. 1996).

Harassment of the witness

The military judge's ruling reiterated the Government's request that he use his authority under M.R.E. 611(a)(3) "to control the scope and mode of witness interrogation, [and] to prevent the harassment of witnesses." Like the identical federal rule, M.R.E. 611 "calls for a judgment under the particular circumstance whether interrogation tactics entail harassment or undue embarrassment." Fed. R. Evid. 611 advisory committee's note, reprinted in 28 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure 320 (1993). In this case, the military judge made no findings about the likelihood that HM2 C would suffer from undue embarrassment or harassment as a result of cross-examination or the presentation of bias evidence. Nor do we see any evidence in the record that defense

counsel planned to conduct cross-examination in a threatening or embarrassing manner.  From a practical standpoint, all bias evidence has some potential to embarrass the witness; after all, counsel is attempting to show that the witness has reason to lie and is promoting the inference that the witness is in fact lying.  See United States v. Williams, 40 M.J. 216, 218 (C.M.A. 1994) ("By definition, effective impeachment evidence should be prejudicial to a witness" being cross-examined.) (emphasis in original).  Moreover, while M.R.E. 611 permits a military judge to impose limitations on the length and details of cross-examination, it does not purport to authorize preemptively shutting the door completely on otherwise relevant cross-examination.  See United States v. Jones, 49 M.J. 85, 88 (C.A.A.F. 1998) (noting that a military judge has wide latitude to restrict cross-examination "'only after there has been permitted as a matter of right sufficient cross-examination'" (quoting United States v. Lindstrom, 698 F.2d 1154, 1160 (11th Cir. 1983))).  The military judge's use of M.R.E. 611 to foreclose any cross-examination into a romantic or sexual relationship without evidence of potential harm was an abuse of discretion under these circumstances.

Waste of time or confusion of issues

The Government also asserted that the uncertainty over whether there was a homosexual relationship between Appellant

and HM2 C was a "disputed collateral matter, which may involve the conflicting testimony of several witnesses, leading to a waste of time and a confusion of the issues for the jury." Although the military judge found that there was conflicting evidence on the existence of a homosexual romantic relationship between Appellant and HM2 C, he made no factual findings about any delay or confusion that could result from the cross-examination of HM2 C or the presentation of extrinsic evidence under M.R.E. 608(c) on the question. From a review of the record, we note that defense counsel planned to ask HM2 C about the relationship and, if she denied it existed, to ask two additional witnesses, one of whom ultimately testified at the court-martial. The record does not support the military judge's decision to take the ultimate questions -- whether that relationship existed and whether it led HM2 C to lie -- away from the members. Having found that Appellant made a threshold showing there was "some evidence" of such a relationship, it was for the members, as the triers of fact, to decide if a relationship existed and if its end caused HM2 C to be biased or to misrepresent. See Bins, 43 M.J. at 85 (noting that it is the military judge's duty to determine only whether there is "some evidence that tend[s] to establish" a fact and finding that the military judge "exceeded his authority and usurped the members'

16

role" when he decided for himself whether the witness was biased for the reason proffered by the appellant).

## Danger of unfair prejudice

The third main argument offered by the Government, but not recited in the military judge's ruling, was that evidence of a homosexual relationship was too prejudicial to be admitted. It was this argument that the CCA credited in its decision upholding the ruling of the military judge, concluding that the military judge did not err in excluding the evidence due to "the prejudicial impact of evidence that would have been of a particularly inflammatory nature in a trial by court-martial." Collier, 2008 CCA LEXIS 53, at *10, 2008 WL 495700, at *4. This conclusion supplied a rationale for the military judge's ruling that the military judge himself did not articulate and, further, it inappropriately focused on a generalized and amorphous "prejudicial impact" without identifying who or what would be prejudiced. Id. (citing as evidence of prejudicial impact the "'high degree of antipathy to homosexuality in the armed forces'" as reflected in congressional findings supporting the mandatory discharge of most servicemembers who engage in homosexual conduct (quoting Phillips, 52 M.J. at 273 (Effron, J., dissenting)).

First, the term "unfair prejudice" in the context of M.R.E. 403 "speaks to the capacity of some concededly relevant evidence

17

to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997) (analyzing the purpose behind Fed. R. Evid. 403, which is identical to M.R.E. 403) (emphasis added); see also Fed. R. Evid. 403 advisory committee's note ("'Unfair prejudice' within [Fed. R. Evid. 403] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). M.R.E. 403 addresses prejudice to the integrity of the trial process, not prejudice to a particular party or witness. In this case, the military judge made no findings related to potential prejudice to the trial process that could be created by evidence of homosexuality, such as a tendency for members either to disbelieve the witness or to find Appellant guilty without a proper basis. In the context of an interracial relationship, the Supreme Court recognized that "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the witness's] testimony." Olden v. Kentucky, 488 U.S. 227, 232 (1988). Any conclusion that the factfinders would be predisposed against either HM2 C or Appellant in this case would have been similarly speculative. Members are presumed to follow a military judge's instructions to consider evidence for a proper purpose, such as bias or

motive to misrepresent, and not let personal beliefs or feelings affect their determinations about witness credibility.  United States v. Taylor, 53 M.J. 195, 198 (C.A.A.F. 2000).

Second, the CCA's decision placed unwarranted emphasis on the military context when it based its conclusion on the potential for unfair prejudice.  We recognize the policy subjecting homosexuals to mandatory separation if they have engaged in, or solicited another to engage in, homosexual acts. 10 U.S.C. § 654(b) (2000).  However, that policy is not a per se indication of unfair prejudice within the military justice system.  This Court has not allowed the military's policy on homosexuality to prevent evidence of homosexuality from being used against an accused.  See Phillips 52 M.J. at 272-73 (permitting trial counsel to offer evidence that the accused was engaged in a homosexual relationship).  And we see no principled reason to prevent an accused from using this same type of evidence to potential advantage, particularly where, as here, Appellant was the proponent of the evidence of a homosexual relationship with the Government's primary witness.  See Williams, 40 M.J. at 218 (stating the military judge erred if he excluded evidence based on the potential for prejudice to the accused because the accused "was the proponent of the evidence and waived objection to any adverse inferences from such evidence").  Finally, we note that the CCA decision relied upon

19

language from the dissenting opinion in Phillips to conclude that the evidence was too prejudicial.  Collier, 2008 CCA LEXIS 53, at *10-*11, 2008 WL 495700, at *4.  The dissent in Phillips, however, did not foreclose the possibility that evidence of a homosexual relationship could be admissible.  See Phillips, 52 M.J. at 273 (Effron, J., dissenting) (recognizing that "a sexual relationship that both pre-dates and post-dates a marriage, regardless of sexual orientation, is potentially relevant on the question of whether the marriage is a sham").

Because the military judge's ruling lacked an articulated or supportable legal basis, and was thus an abuse of discretion, and the decision of the CCA was based on speculation about prejudicial impact unrelated to any specific findings of the military judge,[2] we find that the limitation on cross-examination and related bias evidence was a violation of Appellant's Sixth Amendment confrontation rights.

B.  Harmlessness beyond a reasonable doubt

Having found constitutional error, the question remains whether that error was harmless beyond a reasonable doubt.  Chapman v. California, 386 U.S. 18, 24 (1967).  In the case of limitation of cross-examination, "the correct

---

[2] For example, the military judge made no comments or assessment on the record of prejudice related to the risks of investigation and separation associated with the military's "Don't Ask, Don't Tell" policy, which was the prejudice referenced by the CCA. Collier, 2008 CCA LEXIS 53, at *10, 2008 WL 495700, at *4.

inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 684. The burden is on the Government to show that "there is no reasonable possibility" that the error "contributed to the contested findings of guilty." United States v. Othuru, 65 M.J. 375, 377 (C.A.A.F. 2007). An error has not contributed to the verdict when it was "'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" Id. (quoting Yates v. Evatt, 500 U.S. 391, 403 (1991), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 72 n.4 (1991)).

To find that the error here warrants relief, we need not conclude that Appellant's defense would have succeeded. Instead the inquiry should focus on whether the military judge's ruling "essentially deprived Appellant of [her] best defense" that "may have tipped the credibility balance in Appellant's favor." Moss, 63 M.J. at 239. Because this error was a violation of Appellant's right to confront witnesses, we apply the balancing test articulated by the Supreme Court in Van Arsdall:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

At trial, Appellant's strategy was to discredit HM2 C's testimony through the use of bias evidence. The main theory offered to defend against the larceny charges was that HM2 C framed Appellant for the theft of the tools by buying and etching tools to look like they came from the squadron. Due to the military judge's limitation on cross-examination of HM2 C, defense counsel was able to offer only the end of a friendship as motivation for the framing. If there had been no such limitation, and depending on the evidence introduced at trial, defense counsel could have argued that HM2 C's distress over the breakup of her romantic relationship with Appellant inspired her to frame Appellant. In addition, defense counsel wanted to show that Appellant slashed HM2 C's tire out of anger over the breakup, rather than with the intent to influence testimony. After considering the Van Arsdall factors in relation to these defense strategies, we find that on balance they compel the conclusion that the limitation on cross-examination and related evidence was not harmless beyond a reasonable doubt.

Obstruction charge

On the obstruction charge, the Government had circumstantial evidence of motive that included the following facts: (1) Appellant had been informed about the pending larceny charges; (2) Appellant knew HM2 C had turned her in; and (3) the offense occurred about one month after Appellant had been informed the larceny charges. A civilian testified that Appellant admitted to her that she was the one who slashed HM2 C's tire. Because HM2 C was one of only two witnesses on the influencing testimony charge, any additional damage to HM2 C's credibility could have been very significant to the outcome of the case. The other witness was the civilian police officer in charge of the investigation, but her testimony only established the fact that Appellant admitted slashing the tire. The detective testified that she did not discuss the impending court-martial with HM2 C and therefore did not establish the motive necessary to prove obstruction of justice. When defense counsel was prevented from trying to elicit evidence of a romantic or sexual relationship between Appellant and HM2 C, Appellant lost her best chance at showing the tire slashing was motivated by anger over the end of that relationship, rather than an attempt to influence testimony.

Larceny Charge

To assess the strength of the Government's case on the larceny charge, we must take into account the presence of the following corroborating evidence. Many, although by no means all, of the tools HM2 C returned to Appellant's command had the helicopter squadron's markings etched on them. There was testimony that all of the recovered tools were ones that the squadron typically kept in stock, and that some of them were specialized to aircraft. One of the bags of tools returned to the squadron also contained personal papers belonging to Appellant. In addition, one of Appellant's coworkers testified that he once saw her struggling to remove a heavy bag of unknown contents from the squadron.

On the other hand, the larceny case was based on circumstantial evidence: Appellant did not confess; no one saw or claimed to see her actually take the tools; and no fingerprint evidence was presented. Although a Government witness testified he saw Appellant removing a heavy bag from the squadron, there was also testimony from a defense witness that Appellant stored heavy ratings manuals in a duffel bag in their shared locker. Some of the physical evidence presented supported Appellant's theory of the case: all of the tools appeared to be new, and some were still in their original packaging. Although some tools were etched, an etcher was found

with the tools, which supports Appellant's theory that HM2 C bought the tools herself and etched them. Testimony at trial established that the command code, either "B10" or "B1," was marked by hand on the tool itself. Because this code was a simple marking, anyone who knew it could have etched it into the tools. Testimony also established that many, if not all, of the tools could have been purchased at a retail store such as Sears. Finally, HM2 C was a principal prosecution witness and, as the person who found the tools, her testimony was crucial to the case. The case was initiated solely by HM2 C's report; otherwise, no one at HC-8 had noticed that any tools were missing, and no inventory list showed any missing tools.

Looking at the extent of cross-examination otherwise permitted, none was specifically allowed on the romantic or sexual nature of the relationship. This favors Appellant, unless there was "effective cross-examination without the use of the excluded evidence." Williams, 40 M.J. at 219. Defense counsel was permitted to ask HM2 C about several things that could have indicated she had a motive to lie about the tools, including: HM2 C's concern that Appellant had a crush on her; situations in which Appellant contributed to tensions between HM2 C and her boyfriend or between HM2 C and her daughter; and HM2 C's unsuccessful attempt to take out a restraining order on Appellant. As we have previously emphasized, however, there is

a qualitative difference between the cross-examination permitted by the military judge and the prohibited inquiry into a failed romantic, sexual relationship. When Appellant was refused permission to delve into the motive to lie that would arise from that kind of experience, she was deprived of her best chance to show the members that HM2 C was biased to the extent that she would fabricate the story about the tools or frame Appellant.

Adding insult to injury, the Government exploited the very evidentiary limitation it requested in closing argument. "Are we supposed to believe that [HM2 C] or somebody else went out and spent $2,700.00 on tools to set this up because she's mad at somebody? That strains all logic; it's just not credible." Transcript of Record at 620, Collier, No. 08-0495. Even if it would seem incredible for an ex-friend to concoct this type of revenge, it would not strain all logic to imagine that an ex-lover would do so. The cross-examination that was prohibited "may have tipped the credibility balance in Appellant's favor." Moss, 63 M.J. at 239. That we find this could have tipped the balance does not mean it will, or even should, do so at a rehearing. But ultimately, that is for the finders of fact to determine, not this Court.

## III. Decision

Under all the circumstances, and particularly in light of the Government's closing argument, we cannot say that the error

26

was "unimportant in relation to everything else the jury considered," and therefore, there is a reasonable possibility it contributed to the verdict and it was not harmless beyond a reasonable doubt.  Othuru, 65 M.J. at 377 (citation and quotation marks omitted).  The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed.  The findings of guilty to both the charges and specifications and the sentence are set aside and a rehearing is authorized.

United States v. Collier, No. 08-0495/NA

BAKER, Judge (dissenting):

This Court reviews a military judge's decision on the admissibility of evidence under an abuse of discretion standard. United States v. Collier, __ M.J. __ (13) (C.A.A.F. 2009). In this case, the military judge made a reasonable decision to exclude the evidence of Appellant's alleged sexual relationship with HM2 C, certainly a decision that was within his discretion. This Court should not reverse that decision because it would have reached a different result.

## DISCUSSION

"To reverse for an abuse of discretion involves far more than a difference . . . in opinion. . . . The challenged action must [be] . . . clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987) (citations and quotation marks omitted) (brackets added; ellipses in original). The military judge conducted a Military Rule of Evidence (M.R.E.) 403 balancing test, which he articulated on the record, and placed reasonable limits on the manner in which Appellant could seek to impeach HM2 C's testimony based on their alleged sexual relationship.

A.   Deference

The majority concludes that we should "accord the military judge's ruling less deference" because he failed to articulate

his analysis on the record.  Collier, __ M.J. at __ (14).  A

military judge is only required to "record his balancing

analysis to the extent that his exercise of discretion may be

fairly reviewed on appeal."  Government of the Virgin Islands v.

Archibald, 987 F.2d 180, 186 (3d Cir. 1993) (citation and

quotation marks omitted).  In my view, the military judge's

articulation makes it clear how and why he determined that

evidence of an alleged sexual relationship was not legally

relevant to bias and why the M.R.E. 403 and M.R.E. 611

considerations outweighed any potential factual relevance.  The

military judge cited the parties' arguments to explore, on the

one hand, the probative value of the evidence, and, on the other

hand, the risk of prejudice, confusion, and waste of time.  The

record reflects that the military judge conducted a "proper

balancing test" under M.R.E. 403, and this Court should give the

appropriate deference to his ruling.  United States v. Manns, 54

M.J. 164, 166 (C.A.A.F. 2000).

   B.  M.R.E. 403

   Based on his analysis, the military judge found that the

probative value of an alleged homosexual relationship to show

HM2 C's bias was "substantially outweighed by the danger of

unfair prejudice, confusion of the issues" and "waste of time."

M.R.E. 403.  This conclusion was based, inter alia, on the

disputed nature of Appellant and HM2 C's relationship.

2

Appellant's proffer consisted of her statement to the military judge that the relationship was sexual. Although defense counsel offered no further detail or tangible evidence of a sexual relationship, defense counsel stated that, "there are two other witnesses that we could call that would provide extrinsic evidence that would go to her bias."[1] However, as defense counsel acknowledged, HM2 C denied that the relationship was sexual. So did HM2 C's daughter, who filed an affidavit stating that the relationship was based on friendship and "nothing more."

Based on the information presented during the Article 39(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 839(a) (2000), session and in the parties' briefs on the Motion for Appropriate Relief, the military judge reached the following findings and conclusions:

- "The defense has met their preliminary burden that the break-up of the relationship between this key witness and the accused may relate to motive by the witness to make the false allegation of larceny of military property."[2]

---

[1] One of these witnesses was the detective who investigated the case.

[2] Findings and Ruling on Government Motion In Limine at 2, United States v. Collier, Special Court-Martial, Tidewater Judicial Circuit (Nov. 24, 2004).

- "The government presented evidence by cross-examination of the accused and by affidavit that tends to refute any sexual aspect to the relationship."[3]

- "[T]he sexual nature of this relationship is not sufficiently relevant."[4]

The military judge noted, "under [M.R.E] 403, . . . there's a danger that there's going to be a confusion of the issues because what the trial may deteriorate into is a trial within a trial as to whether or not there was a sexual relationship." In this case, the risk was well-founded, as would be the case regardless of the nature of the evidence offered, not less so because of the sensitive nature of this information. Indeed, this raised the specter that HM2 C would be put "on trial" in addition to the accused.

Further, the military judge looked to M.R.E. 611 "to control the scope and mode of witness interrogation, to prevent the harassment of witnesses." Questions regarding a homosexual relationship not only had the risk of embarrassing HM2 C, they carried the potential risk of investigation and separation under the military's "Don't Ask, Don't Tell" policy. 10 U.S.C. § 654(b)(1) (2000).

---

[3] Id. at 1.
[4] Id. at 2.

Thus, the military judge properly identified the risks associated with permitting testimony regarding a sexual relationship, most of which would exist whether the information pertained to a heterosexual or homosexual relationship. The military judge reasonably concluded that those risks substantially outweighed the probative value of the information.

C.  Reasonable Restriction

A witness's bias "is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'"  Davis v. Alaska, 415 U.S. 308, 316 (1974) (citation omitted).  However, bias evidence, like any evidence, is subject to reasonable restrictions "to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'"  Olden v. Kentucky, 488 U.S. 227, 232 (1988) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)); see also Davis, 415 U.S. at 316 ("Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, . . . the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.").  "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in

whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985).

Consistent with these constitutional dictates, the military judge did not adopt an all or nothing approach, as the majority suggests. Rather, exercising his discretion, the military judge balanced the factors at hand in light of the law permitting the defense "to explore the issue of bias and motive to misrepresent, under M.R.E. 608(c)," and ultimately limited the evidence to uncontested evidence that had less risk of prejudice or harassment. Specifically, the military judge allowed the defense to "characterize the relationship as close, personal and/or emotionally close," but restricted the defense from "open[ing] the issue of any alleged sexual acts between the witness and the accused." The military judge also permitted defense counsel to ask HM2 C whether she "believed [Appellant] had a crush on [HM2 C]." As this Court has said, "once the defendant has been allowed to expose a witness's motivation in testifying, 'it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury.'" United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007) (citation omitted).

D. Speculation About Unfair Prejudice

Even if the military judge had meticulously articulated every detail of his analysis (and he came close), the majority

6

implies that the military judge could not have reached a reasonable decision to exclude the evidence because any such decision would require speculation.  See Collier, __ M.J. at __ (18).  Presented with these facts, if the military judge could not reasonably speculate about "the danger of unfair prejudice, confusion of the issues, or misleading the members" and whether those considerations outweigh the probative value of evidence, it seems that the military judge had no discretion whatsoever. M.R.E. 403.

The majority compares this case to Olden v. Kentucky, in which the Supreme Court held that the judge abused his discretion by excluding evidence of an interracial sexual relationship based on "[s]peculation as to the effect of jurors' racial biases."  488 U.S. at 232.  However, in contrast to this case, the relationship at issue in Olden was uncontested.  Id. at 230.  Further, while the relationship in Olden showed the victim's potential motive to lie about the crime, as in this case, Appellant's theory is much less plausible than that presented in Olden.  Id.  In addition to lying about the crime, Appellant and the majority posit that HM2 C purchased 215 tools (even though it is questionable whether all were publicly available for purchase), etched Appellant's command code on 65 of them, and otherwise fabricated the entire crime.  Collier, __ M.J. at __ (24-25).  Thus, under this theory, after exposing

7

herself to perjury charges, revealing an illicit sexual relationship, and risking separation from the service, HM2 C would have her revenge.  This theory, of course, also presupposes that the Navy, having received the store-bought tools, negligently concluded that the tools were government property or wittingly joined in HM2 C's conspiracy.

Additionally, the majority argues that the suggestion of a sexual relationship would have made it more likely that Appellant slashed HM2 C's tires out of anger, rather than to interfere with the key witness against her.  Id. at __ (23).  Here too, rather than speculating about how the members might apply this information, the military judge's well-balanced decision permitted the members to draw their own reasonable conclusions regarding the animosity between Appellant and HM2 C.  The members heard that HM2 C and Appellant had a falling out, HM2 C attempted to obtain a restraining order against Appellant, and that, just prior to the tire slashing incident, they had argued about HM2 C returning Appellant's property to her.  It is doubtful that an additional suggestion, disputed and refuted, of a sexual relationship between Appellant and HM2 C would have caused the members to reach a different verdict.

It equally "strains all logic" to suggest that an angry, vengeful lover would go to such extremes, but that an "angry, vengeful friend" would not.  Id. at __ (2).  To be sure, it is a

8

leap in logic to conclude that a sexual relationship would drive someone to do all this in a way that the disintegration of a relationship that was "emotionally close" and "closer than ordinary friends" would not. It also thoroughly discounts the sophistication of military members to identify and assess the myriad ways in which relationships are formed and broken and the hurt that results. Therefore, the military judge reasonably concluded that information about the alleged sexual nature of Appellant's and HM2 C's relationship, above and beyond what the military judge actually admitted, was "not sufficiently relevant."

CONCLUSION

Limiting defense questioning about a witness's sexual life absent a valid showing of proof and legal relevance is a reasonable limitation on an accused's right to present a defense and confront a witness. The military judge properly used his discretion to allow Appellant to identify HM2 C's potential bias while limiting it to avoid prejudice, confusion, waste of time, and harassment of the witness.

As a result, like the United States Navy-Marine Corps Court of Criminal Appeals, I would conclude that the military judge did not abuse his discretion by excluding evidence of an alleged sexual relationship between HM2 C and Appellant. United States v. Collier, No. NMCCA 200601218, 2008 CCA LEXIS 53, at *11, 2008

9

WL 495700, at *4 (N-M. Ct. Crim. App. Feb. 21, 2008)

(unpublished).  I respectfully dissent.