# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KRIMBILL, BROOKHART, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Captain WILLIAM K. SMITH**
**United States Army, Appellant**

ARMY 20180286

Headquarters, United States Army Alaska
Lanny J. Acosta, Jr., Military Judge
Colonel Roseanne M. Bennett, Staff Judge Advocate

For Appellant: Major Joseph C. Borland, JA; Michael J. Millios, Esquire (on brief and reply brief).

For Appellee: Lieutenant Colonel Wayne H. Williams, JA; Major Hannah E. Kaufman, JA; Captain Anthony A. Contrada, JA (on brief).

28 February 2020

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BROOKHART, Senior Judge:

Contrary to his pleas, a panel of officers sitting as a general court-martial convicted appellant of three specifications of sexual assault[1] in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. The convening authority approved the adjudged sentence of a dismissal, confinement for three years, and forfeiture of all pay and allowances, and credited appellant with one day against his sentence to confinement.

---

[1] As discussed in detail below, after findings, the military judge found, in part based on the government's concession, that the three specifications of sexual assault were charged in the alternative. In turn, the military judge conditionally dismissed Specifications 2 and 4 of the Charge, subject to Specification 3 of the Charge surviving appellate review.

This case is now before us for review pursuant to Article 66, UCMJ. Appellant raises four assignments of error. While we briefly discuss each below, none warrant relief.[2]

## BACKGROUND

Appellant was initially charged with one specification of conduct unbecoming an officer and gentleman in violation of Article 133, UCMJ, and four specifications of sexual assault in violation of Article 120, UCMJ. The sexual assault allegations all involved the same victim, at the same time, and in same location. The government conceded that the sexual assault specifications were charged in the alternative, with each specification expressing a different theory of liability. The first specification alleged sexual assault by administering a drug or intoxicant; the second alleged sexual assault when appellant knew or should have known the victim was asleep or unconscious; the third alleged the victim was incapable of consenting due to impairment by a drug or other intoxicant; and the fourth alleged sexual assault by causing bodily harm, with the bodily harm being the penetrative act. Before trial, the government dismissed the conduct unbecoming charge and the specification alleging sexual assault by administering a drug or intoxicant.

The evidence and testimony at trial showed that appellant was a married transportation officer stationed at Fort Wainwright, Alaska. In early 2016, appellant traveled, in his personal capacity, to Honolulu, Hawaii, to investigate the possibility of buying a Merry Maids cleaning service franchise located in that city. Ms. AT was a twenty-one-year-old employee of Merry Maids in Honolulu. Ms. AT had only recently joined the company after moving from Wisconsin. Ms. AT lived in one of two bedrooms located in the back-half of the Merry Maids office. Another employee, Ms. Cathy Brown, lived in the other bedroom.

On 15 February 2016, appellant, Ms. AT, and Mr. Scott Williams, the manager of the Merry Maids, all went out to dinner. Ms. AT testified that she remembered having one alcoholic drink at dinner. After dinner, they returned to the Merry Maids office and Mr. Williams eventually departed. Appellant and Ms. AT then went to another bar to discuss the future of the company. Ms. AT remembered having two more drinks at the bar. She also remembered appellant being with her in a bar bathroom while she was throwing up. Ms. AT's next memory was waking up briefly with appellant on top of her, before passing out again. She testified that she awoke sometime later, naked, with appellant in her room at the Merry Maids office. Ms. AT asked appellant, "what time is it," and then asked him to leave. Ms. AT

---

[2] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they are without merit.

testified that she did not remember any details, including being penetrated by appellant, but she did believe she had been raped. She also testified that she had what she believed to be semen dripping from her vagina.

Immediately after appellant's departure, Ms. AT knocked on Ms. Brown's door and told her she believed she had been raped. Ms. Brown testified that prior to falling asleep, she heard, but did not see, appellant and Ms AT enter the Merry Maids office at 2200 hours. She believed that they left again and she testified that she did not hear or see anything further until Ms. AT woke her in the early morning hours to report being raped. Ms. Brown believed she was awoken at around 0400 hours. Ms. Brown testified that she called Mr. Williams to seek assistance. At some point, Ms. AT was able to call her mother in Wisconsin and tell her mother that she believed she had been raped. Her mother also encouraged her to report the incident and go to the hospital.

For his part, Mr. Williams testified that Ms. Brown called him at 0200 hours. He indicated he also spoke with Ms. AT at some point. He then traveled to the Merry Maids office to assist. When he arrived, Mr. Williams testified that Ms AT was visibly upset and wanted to go the hospital. Mr. Williams took her to one hospital which could not perform a sexual assault examination, therefore, they drove to another hospital.

At the hospital, Ms. AT was taken for a sexual assault examination based upon her report. Dr. Wayne Lee conducted the examination of Ms. AT. He testified that as part of the examination, he took a sample of fluid he found in Ms. AT's vagina. Dr. Lee immediately examined the fluid using a microscope. Based on his training and experience, Dr. Lee testified that the sample contained semen. The sample was packaged and sent off for further forensic testing along with other evidence collected. The results from that testing were not admitted at trial because the government could not establish the chain of custody.

Ms. AT also provided a urine sample as part of the examination, but declined to provide a blood sample. Her urine sample was also sent for testing by the Honolulu police department, however, the sample was not properly sealed and was therefore discarded by the lab without any testing. The Honolulu police investigators also went to the Merry Maids office to take photographs and look for any possible evidence. However, no DNA evidence was found and no physical evidence of any kind was admitted at trial by the government.

The case was ultimately turned over to the Army Criminal Investigation Command (CID) for further investigation. As part of their activity on the case, CID investigators obtained a receipt for the credit card purchases made by appellant while he was at the bar with Ms. AT. The receipt, which was admitted by appellant, indicated he purchased eight drinks at the bar between approximately 1952 hours and

2122 hours. An employee from the bar was called to testify as to their billing process and to the typical strength of the drinks identified on the receipt. The evidence presented indicated that appellant and Ms. AT closed out their tab at the bar shortly before 2200 hours.

The government also called Mr. Kurt McDonald, the owner of the Merry Maids franchise in Hawaii, as well as one in Anchorage. Alaska. Mr. McDonald testified that he lived in Alaska and that he rented part of his home to appellant and appellant's wife. According to Mr. McDonald, he became friends with appellant and learned that appellant was interested in owning a business. Mr. McDonald tried to sell the Merry Maids franchise in Hawaii to appellant, although appellant ultimately bought the franchise in Alaska instead.

Mr. McDonald testified that a few weeks after appellant returned from Hawaii, they discussed the alleged sexual assault. Appellant told Mr. McDonald that he and Ms. AT drank at more than one bar after dinner. Appellant also told Mr. McDonald that Ms. AT became sick and vomited sometime during the evening. Appellant told Mr. McDonald that he took Ms. AT back to Merry Maids, helped her shower and then put her in bed. According to appellant, Ms. AT had trouble walking, was "like Jell-O," and she had to be helped to bed. Appellant told Mr. McDonald that Ms. AT asked, "Are you going to fuck me now," at which point appellant admitted to Mr. McDonald that he had vaginal and anal sex with Ms. AT. He told Mr. McDonald that he ejaculated in Ms. AT's anus and wiped himself on her sheets before he left. Appellant also told Mr. McDonald that Ms. AT was "out of it." Mr. McDonald testified he took appellant's statements to mean they were both really drunk. During his testimony, Mr. McDonald interjected that he believed what appellant described was consensual sex, however, the military judge sustained a government objection.

Appellant's military defense counsel conducted an extensive cross-examination of Mr. McDonald. That questioning revealed inconsistencies internal to Mr. McDonald's testimony and with other facts in the case. Defense counsel further suggested that Mr. McDonald added key details to appellant's admission between the time he spoke with law enforcement and when he later spoke with prosecutors. On cross-examination, Mr. McDonald admitted that he had lied to Alaska State Troopers in an unrelated matter. He also admitted that appellant had not been making payments for the purchase of the Alaska Merry Maids franchise, and acknowledged that he had debts and liens from unrelated business matters.

Next, defense counsel demonstrated that Mr. McDonald had sought assistance from government counsel in collecting the debt from appellant. Defense counsel also questioned Mr. McDonald on a phone message he left for civilian defense counsel, which stated that he was "meeting with the opposition telephonically, tomorrow" and that he "would love to hear from [appellant] before then, please."

Defense counsel used the phone message to suggest that Mr. McDonald was willing to shape his testimony. Defense counsel also demonstrated that after the interview, Mr. McDonald again left a message with civilian defense counsel which indicated that he was completely honest with "the opposition" and that it may not have been "flattering" to appellant, but "the bottom line was the sex was consensual." He also asked defense counsel to have appellant start sending him the money owed for the franchise. This evidence was used to suggest that Mr. McDonald's testimony had been influenced by the debt.

Appellant also called several witnesses during the defense case. Dr. Shimimora, a forensic toxicologist, testified that Ms. AT's urine sample might still have been tested despite having been improperly sealed. He also testified that had the urine been tested, it would have likely indicated if any drugs or alcohol were in Ms. AT's system around the time she was sexually assaulted.

Dr. Keppler, a forensic psychiatrist, testified about the effects of alcohol on memory and on a person's actions. He described how alcohol can put a person in a blackout state wherein they cannot form memories, but where they can still make reasoned decisions, such as consenting to sex, and where they might interact in a manner that would appear sober and capable of consenting. Dr. Keppler opined that based on the evidence at trial, Ms. AT was likely in such a blackout state during the sexual assault.

After hearing all the testimony and considering all of the evidence, the panel ultimately found appellant guilty of all three specifications of sexual assault. The military judge then conditionally dismissed Specifications 2 and 4 of the Charge, subject to Specification 3 of the Charge surviving appellate review.

## LAW AND DISCUSSION

### *Legal and Factual Sufficiency*

Appellant's first assignment of error is that his sexual assault conviction is legally and factually insufficient. We disagree.

Courts of Criminal Appeals hold findings of guilt legally sufficient when "any rational fact-finder could have found all essential elements of the offense beyond a reasonable doubt." *United States v. Nicola*, 78 M.J. 223, 226 (C.A.A.F. 2019) (citations omitted). In conducting our legal sufficiency review, we are obligated to draw "every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Robinson*, 77 M.J. 294, 298 (C.A.A.F. 2018) (citations omitted). "As such, the standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation and internal marks omitted).

With regard to factual sufficiency, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). We may not affirm a conviction unless, "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are personally convinced beyond a reasonable doubt of appellant's guilt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). The degree of deference we afford the trial court for having seen and heard the witnesses will typically reflect the materiality of witness credibility to the case. *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015).

In this case, the evidence is both legally and factually sufficient to sustain appellant's sexual assault conviction. The evidence showed that Ms. AT weighed approximately one-hundred pounds at the time she was sexually assaulted by appellant, she had a boyfriend, she was aware appellant was married, and she was not attracted to appellant. Ms. AT testified to consuming at least three alcoholic drinks with appellant. Evidence admitted at trial indicated that it was likely more than the just those three drinks. She testified that she vomited at some point in appellant's presence. She further testified that she woke up once with appellant on top of her before passing out and again waking up naked with appellant in her room. She testified that she felt as if she had been raped and that she found what was later confirmed to be semen coming from her vagina. The evidence showed that she immediately reported what she believed to be a sexual assault to her roommate, and shortly thereafter went to the hospital for a forensic examination.

Admissions from appellant to Mr. McDonald demonstrated that appellant drank at more than one bar with Ms. AT, and that he took Ms. AT back to her room in the Merry Maids office. Appellant further admitted that, at the office, he helped Ms. AT shower because she had vomited on herself. Appellant then admitted to helping Ms. AT to bed because she was "like Jell-O" and had trouble walking. Appellant told Mr. McDonald that he had vaginal and anal intercourse with Ms. AT and that he ejaculated. Appellant also described Ms. AT as "out of it."

Defense counsel conducted a lengthy and effective cross-examination of Mr. McDonald that raised numerous issues that could have impacted his credibility, however, on the whole, his testimony was consistent with Ms. AT's testimony as well as other evidence in the case. Additionally, while appellant offered expert testimony supporting an alternative scenario wherein Ms. AT may have consented, or appeared to have consented but suffered memory loss, the evidence supporting that theory was not conclusive and could have been fairly rejected by the panel.

Accordingly, based on all the facts and evidence, drawing all reasonable inferences in favor of the prosecution, we find that a rational fact-finder could have found all of the essential elements of the offense of which appellant was found

guilty, beyond a reasonable doubt. Further, exercising our independent duty to review the facts, making allowances for not having seen or heard the testimony, we are ourselves convinced of appellant's guilt beyond a reasonable doubt.

*Failure to Test or Preserve Ms. AT's Urine Sample*

Appellant's second assignment of error is that the military judge erred by not abating the case when the government destroyed Ms. AT's urine sample. As discussed below, we disagree.

We review a military judge's failure to abate proceedings under an abuse of discretion standard. *United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (citation omitted). Military judges abuse their discretion when their findings of fact are clearly erroneous, or their decision is influenced by an erroneous view of the law. *Id.* (citing *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013).

The parties to a court-martial are generally entitled to equal access to the evidence. Rule for Courts-Martial [R.C.M.] 703(a). However, the parties are not entitled to production of evidence which has been lost or destroyed. R.C.M. 703(f)(2). When evidence is lost or destroyed, judges must employ a three-part test to determine if abatement is appropriate. *Simmermacher*, 74 M.J. at 201-02; *see also* R.C.M. 703(f)(2).

The first prong of the test asks whether the "lost or destroyed evidence [is] of such central importance that it [is] essential to a fair trial." *Simmermacher*, 74 M.J. at 201-02. The second prong asks whether there is an "adequate substitute" for the lost or destroyed evidence. *Id.* at 202. Finally, the third prong looks to determine whether the requesting party was at "fault" for the loss or destruction of the evidence, or whether the loss "could have been prevented by the requesting party." *Id.* If all three parts of the test are met, then abatement may be an appropriate remedy if lesser remedies are insufficient. *Id.*

In this case, a urine sample taken from the victim shortly after the sexual assault occurred was destroyed without any testing because it apparently had not been properly sealed. Appellant raised the issue at trial through a motion for appropriate relief, seeking abatement. After hearing argument and adopting the facts presented by appellant, the military judge denied the motion for abatement, holding that the urine sample was not of central importance to the case. We agree.

At best, testing of the sample would have revealed the presence or absence of any drugs in Ms. AT's system near the time of the assault.[3] However, as the government points out, the case was not premised on Ms. AT being drugged, or even whether Ms. AT consumed any alcohol at all. Instead, appellant's remaining conviction is for engaging in a sexual act with Ms. AT while she was *too intoxicated* to consent due to her consumption of alcohol. While the presence or absence of drugs might have been relevant if the government presented evidence that Ms. AT was unable to consent because she was impaired by some other type of intoxicant, here, the government focused their argument and evidence entirely on Ms. AT's level of intoxication after her consumption of alcohol. No evidence was presented indicating that appellant had administered any drug to Ms. AT, and no evidence was presented that Ms. At was under the influence of anything other than alcohol. Ms. AT herself testified only that she was intoxicated from alcohol. Appellant's expert also testified that Ms. AT's symptoms were consistent with alcohol, not other drug use. Finally, during closing argument, the government stressed that the case was strictly about alcohol. Accordingly, based upon all of the foregoing, we hold that the destroyed urine sample was not of central importance to any issue in the case. As such, the military judge did not abuse his discretion in denying appellant's request to abate the proceedings.

*Cross-Examination of Mr. McDonald*

Appellant's third assignment of error alleges that his constitutional right to confrontation was violated when the military judge improperly limited his cross-examination of Mr. McDonald. Again, we disagree.

On cross-examination, trial defense counsel sought to question Mr. McDonald about an outstanding bench warrant for an unrelated physical assault against a former employee. When trial counsel objected, defense counsel initially responded that the warrant and underlying assault were evidence of bias under Military Rule of Evidence [Mil. R. Evid.] 608(c). Specifically, defense counsel argued that the evidence demonstrated that the "walls were closing in on [the witness], so much that he's assaulted people he worked with and is willing to go to really, any length to get the money he needs," including "putting [appellant] behind bars so he can take back the Merry Maids franchise." When the military judge asked defense counsel to clarify how that rule applied, defense counsel apologized for misspeaking and indicated that the evidence was intended to be offered under Mil. R. Evid. 608(b)(1),

---

[3] Appellant's expert testified that the urine sample might also have revealed the presence or absence of alcohol. However, he was clear it could not have provided information on Ms. AT's blood alcohol content. Given the overwhelming evidence of alcohol use, we find that any results from the urine sample regarding the mere presence of alcohol would have been cumulative.

as a specific instance of conduct probative to Mr. McDonald's character for truthfulness. The military judge ruled that an allegation of an unrelated physical assault was not probative on the witness's truthfulness and instructed trial defense counsel to move on to another question. Defense counsel did not revisit Mil. R. Evid. 608(c) as a basis for admitting the testimony.

Trial rulings limiting cross-examination are reviewed for an abuse of discretion. *United States v. Shaffer*, 46 M.J. 94, 98 (C.A.A.F. 1997) (citation omitted). Here, we hold that the military judge did not abuse his discretion in limiting the cross-examination of Mr. McDonald on a bench warrant for an unrelated assault. The military judge controls the examination of witnesses and has broad discretion to impose reasonable limits based upon grounds such as prejudice, confusion of the issues, and relevance. *See* Mil. R. Evid. 611; *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). In this case, defense counsel clarified the theory of admissibility for the bench warrant testimony was Mil. R. Evid. 608(b)(1), which allows inquiry into specific instances of conduct on cross-examination only if they are probative of the witness's character for truthfulness. However, the warrant was apparently for an unrelated physical assault. The military judge ruled that a warrant based on a physical assault was not probative of the witness's truthfulness. That ruling was certainly not an abuse of discretion. *See United States v. Montgomery*, 56 M.J. 660, 667 (Army Ct. Crim. App. 2001) ("Acts of violence . . . generally have little or no direct bearing on honesty and integrity.") (citing *United States v. Weaver*, 1 M.J. 111, 118 n.6 (C.M.A. 1975)).

Further, even if the military judge erred, we are convinced the error was harmless beyond a reasonable doubt. *See Van Arsdall*, 475 U.S. at 681. During cross-examination, trial defense counsel successfully drew out inconsistencies in Mr. McDonald's testimony, as well as evidence of bias and motive to fabricate based upon financial strain. Moreover, trial defense counsel demonstrated that the witness had previously lied to law enforcement. *See Montgomery*, 56 M.J. at 667 (lying to police is highly probative of veracity). In this context, questions about an unrelated physical assault would have added little to the weight of the already extensive cross-examination.

Finally, we hold that appellant abandoned Mil. R. Evid. 608(c) as a basis for admission without receiving a ruling from the military judge, and instead chose to offer the evidence under another section of the Mil. R. Evid. 608. Accordingly, we find appellant waived that ground for admission. *United States v. Pacheco*, 2019 CCA LEXIS 77, 8 n.9 (Army Ct. Crim. App. 26 Feb. 2019). Even if the error was preserved, as we explained above, the error was harmless beyond a reasonable doubt.

*Post-Trial Delay*

Lastly, appellant argues that dilatory post-trial processing in his case warrants relief. After considering the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972), we find that appellant suffered no prejudice as a result of any delay in the post-trial processing of his case, and is therefore entitled to no relief.

**CONCLUSION**

Upon consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.[4]

Chief Judge KRIMBILL and Senior Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[4] As noted by the military judge, Specifications 2 and 4 of the Charge are conditionally dismissed, subject to Specification 3 of the Charge surviving appellate review.

10