UNITED STATES, Appellee

v.

Paul R. JASPER, Sergeant
U.S. Army, Appellant

No. 13-0013/AR

Crim. App. No. 20100112

United States Court of Appeals for the Armed Forces

Argued April 15, 2013

Decided June 4, 2013

RYAN, J., delivered the opinion of the Court, in which BAKER,
C.J., ERDMANN and STUCKY, JJ., and EFFRON, S.J., joined.


Counsel

For Appellant:  Major Jacob D. Bashore (argued); Colonel
Patricia A. Ham and Lieutenant Colonel Jonathan F. Potter (on
brief); Lieutenant Colonel Imogene M. Jamison.

For Appellee:  Captain T. Campbell Warner (argued); Lieutenant
Colonel Amber J. Roach and Major Daniel D. Maurer (on brief);
Major Catherine L. Brantley.

Military Judge:  James Pohl

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge RYAN delivered the opinion of the Court.

Contrary to his pleas, a panel of officers and enlisted members sitting as a general court-martial convicted Appellant of one specification of indecent conduct, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2006), as well as two specifications of committing an indecent act with a child, and one specification each of knowingly possessing child pornography, knowingly receiving child pornography, persuasion and enticement of sexually explicit conduct for the purpose of producing visual depictions, and obstruction of justice, all in violation of Article 134, UCMJ, 10 U.S.C. § 934 (2006). The adjudged sentence provided for twenty-three years of confinement, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to grade E-1. The convening authority approved only so much of the sentence that provided for eighteen years of confinement, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to grade E-1.

The United States Army Court of Criminal Appeals (ACCA) affirmed the findings and sentence as approved by the convening authority. United States v. Jasper, No. ARMY 20100112, slip op. at 6 (A. Ct. Crim. App. July 13, 2012). We granted Appellant's petition to review the following issues:

2

United States v. Jasper, 13-0013/AR

    I.    WHETHER THE MILITARY JUDGE ERRED WHEN HE ALLOWED THE ACCUSER TO RECLAIM A REGULATORY PRIVILEGE AFTER PREVIOUSLY WAIVING THAT PRIVILEGE AND DISCLOSING THAT THE ACCUSER ADMITTED FABRICATING SOME OF THE ALLEGATIONS AGAINST APPELLANT.

    II.    WHETHER THE ARMY COURT ERRED WHEN IT CREATED A CONSTITUTIONAL "KNOWING" ELEMENT TO MILITARY RULE OF EVIDENCE 510(a) REQUIRING A PRIVILEGE HOLDER TO BE INFORMED OF THE REGULATORY PRIVILEGE IN ORDER FOR THE DISCLOSURE TO BE DEEMED VOLUNTARY.

    III.    WHETHER THE GOVERNMENT'S FAILURE TO ALLEGE THE TERMINAL ELEMENT IN SPECIFICATION 1 OF CHARGE II AND THE SPECIFICATIONS OF THE ADDITIONAL CHARGE RESULTED IN MATERIAL PREJUDICE TO APPELLANT'S SUBSTANTIAL RIGHT TO NOTICE.

    IV.    WHETHER THE MILITARY JUDGE ERRED IN INSTRUCTING THE PANEL MEMBERS THAT IN ORDER TO FIND APPELLANT GUILTY OF POSSESSION OF CHILD PORNOGRAPHY IN VIOLATION OF ARTICLE 134, CLAUSE 1 AND 2, THE IMAGES MUST BE OF A CHILD UNDER THE AGE OF EIGHTEEN, INSTEAD OF UNDER THE AGE OF SIXTEEN AS THE UCMJ DEFINES CHILD.

United States v. Jasper, 72 M.J. 83 (C.A.A.F. 2013) (order granting review).

We hold that the military judge erred in ruling that the clergy privilege protecting statements that the putative child victim made to her pastor under Military Rule of Evidence (M.R.E.) 503 remained intact when both she and her mother affirmatively granted that pastor permission to disclose their communications to trial counsel, and he did disclose them. Waiver under M.R.E. 510(a) does not require that the privilege holder have knowledge that the waived statements would otherwise be privileged, or of how the waived statements will be used.

3

This error, which suppressed critical impeachment evidence -- the putative child victim's statement concerning her sexual abuse allegations against Appellant that "she had made it all up . . . to get attention," -- materially prejudiced Appellant's ability to defend himself against each of the specifications of which he was convicted.  See United States v. Collier, 67 M.J. 347, 355-57 (C.A.A.F. 2009); Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2006).  Consequently, we reverse the ACCA's decision and set aside the findings and sentence without reaching the remaining issues.

## I.  FACTS

Appellant's convictions are all related to alleged sexual conduct between Appellant and his stepdaughter, BK, occurring between 2006 and 2007, and in 2009.  Prior to trial, pursuant to Rule for Courts-Martial (R.C.M.) 701(a)(6), trial counsel disclosed to the defense that the Government had learned that, in 2007, BK had told her pastor that she had made up the earlier allegations against Appellant to get attention.

Defense counsel moved to compel production of Pastor Ron Ellyson, who had provided spiritual counseling to BK.  At the motion hearing, defense counsel conceded that the clergy privilege, M.R.E. 503, applied to BK's conversations with Pastor Ellyson, and agreed that the issue was whether BK and her

4

mother, AJ, had waived the privilege under M.R.E. 510(a) when they gave Pastor Ellyson permission to disclose the communications to trial counsel.

At the motion hearing, Pastor Ellyson testified that trial counsel had contacted him to discuss obtaining consent from BK and AJ to disclose the communications he had with BK. After contacting his attorney, Pastor Ellyson called AJ and asked for her permission to disclose the communications, but did not explain that the communications were protected under the clergy privilege or inform her of the possible ramifications of disclosure.

AJ gave Pastor Ellyson permission to disclose the communications he had with BK. Although BK was not present when AJ spoke with Pastor Ellyson, BK later left Pastor Ellyson a voice message in which she also gave him permission to disclose their communications. While Pastor Ellyson testified that he did not tell AJ who would hear the information, both AJ and BK testified that they understood that the disclosure was to be made only to trial counsel.

After receiving permission to disclose the communications from AJ and BK, Pastor Ellyson spoke with trial counsel and disclosed that BK had told him that "she had made it all up at that time to get attention." Trial counsel subsequently

5

provided this favorable information to the defense and visited both AJ and BK to inform them that BK's communications were protected by the clergy privilege and that they could assert the privilege to prevent disclosure of BK's communications to Pastor Ellyson.

At the motion hearing, AJ and BK sought to assert their privilege to prevent Pastor Ellyson from disclosing the communications he had already disclosed to trial counsel with their permission. After hearing AJ and BK's testimony as to the circumstances under which they had given Pastor Ellyson permission to disclose the communications to trial counsel, the military judge ruled that there had been no waiver and denied Appellant's motion to produce Pastor Ellyson because "any testimony that [he] would have would be inadmissible."

At trial, the Government principally relied on AJ and BK's testimony to prove that Appellant had committed the charged offenses. See infra Part III.C. Moreover, despite his knowledge of BK's exculpatory statement to Pastor Ellyson, trial counsel argued in closing that BK was credible, stating that "you can't make [BK's testimony] up," "the kinds of details [that BK recalled] that if you're making something up, just don't come out," and "[i]t went down just the way she explained it."

## II. ACCA DECISION

As relevant to our decision, Appellant argued before the ACCA that the military judge erred in ruling that the clergy privilege protected BK's statements to Pastor Ellyson from disclosure because the privilege had been waived when AJ and BK granted Pastor Ellyson permission to disclose the communications. In affirming the findings and sentence, the ACCA held that the military judge did not abuse his discretion in ruling that neither BK nor AJ had waived the privilege under M.R.E. 510(a). Jasper, No. ARMY 20100112, slip op. at 4, 6. The ACCA relied on the fact that "no one informed AJ nor BK that they had a right to maintain the confidentiality of BK's communications with Pastor Ellyson in the court-martial process," and that "AJ and BK both believed that the disclosure was limited to the trial counsel." Id. at 4. In light of these facts, the ACCA held that the circumstances "[did] not demonstrate a knowing intent to make the information public," and "[n]either AJ nor BK voluntarily consented 'to disclosure of any significant part of the matter or communication under such circumstances that it would be inappropriate to allow the claim of privilege.'" Id. (quoting M.R.E. 510(a)).

7

### III. DISCUSSION

A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion. United States v. McElhaney, 54 M.J. 120, 132 (C.A.A.F. 2000). "To find an abuse of discretion requires more than a mere difference of opinion -- the challenged ruling must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." Id. (internal quotation marks and citation omitted).

The parties agree that, as an initial matter, the clergy privilege, M.R.E. 503, applied to BK's communications with Pastor Ellyson. The sole question before us, then, is whether the privilege was waived under M.R.E. 510(a). If the privilege was waived, the military judge abused his discretion in denying Appellant's motion to produce Pastor Ellyson and excluding BK's statements to him. See United States v. McCollum, 58 M.J. 323, 327 (C.A.A.F. 2003).

Contrary to the ACCA's holding, where, as here, the privilege holder, in the absence of factors like coercion or trickery, affirmatively consents to the disclosure of the privileged communication to a third party, the privilege is waived, regardless of whether the privilege holder was aware that: (1) the communication was privileged, or (2) consenting to the disclosure of the communication waived the privilege.

8

Here, the military judge erred in denying Appellant's motion to produce Pastor Ellyson and excluding BK's statements to him as privileged, and that error was not harmless beyond a reasonable doubt.

A.

M.R.E. 503(a) provides that:

> A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman . . . if such communication is made either as a formal act of religion or as a matter of conscience.

The clergy privilege may be claimed by the person, the person's guardian, or the clergyman on behalf of the person. M.R.E. 503(c). Under M.R.E. 510(a), a privilege is waived "if the person . . . voluntarily discloses or consents to disclosure of any significant part of the matter or communication under such circumstances that it would be inappropriate to allow the claim of privilege." Here, there is no question that both BK and her guardian, AJ, affirmatively consented to Pastor Ellyson's disclosure of the statements to trial counsel. Under such circumstances, and for the reasons below, we think that "it would be inappropriate to allow the claim of privilege" to prevent defense counsel from using BK's statements at trial. Id.

"Testimonial exclusionary rules and privileges contravene the fundamental principle that the public . . . has a right to every man's evidence." Trammel v. United States, 445 U.S. 40, 50 (1980) (internal quotation marks and citation omitted). Because privileges "run contrary to a court's truth-seeking function," they are narrowly construed. United States v. Custis, 65 M.J. 366, 369 (C.A.A.F. 2007). While "determining waiver of a privilege is an 'evaluation [that] demands a fastidious sifting of the facts and a careful weighing of the circumstances,'" id. at 371 n.9 (quoting In re Keeper of the Records (XYZ Corp.), 348 F.3d 16, 23 (1st Cir. 2003)), waiver has never turned on anything more than the requirement set forth in M.R.E. 510(a) that the privilege holder "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." See M.R.E. 510(a).

This Court has not previously considered waiver under M.R.E. 510(a) in the clergy privilege context. However, in the marital privilege context, we have never conditioned waiver on the privilege holder's awareness of the privilege. See McElhaney, 54 M.J. at 132 (holding that elliptical references to the content of a marital communication voluntarily made to a third party was sufficient to waive privilege); McCollum, 58 M.J. at 339 ("[V]oluntary consent to disclose is given where one

10

spouse either expressly or implicitly authorizes the other to share information with a third party.").

Moreover, courts have found waiver on nothing more than the privilege holder's failure to take adequate precautions to maintain confidentiality, see United States v. Hamilton, 701 F.3d 404 (4th Cir. 2012) (finding waiver where the defendant put confidential communications in work e-mail), and have expressly disavowed the notion that, for a waiver to be valid, the privilege holder must intend to waive the privilege -- instead, whether a waiver is valid turns on whether the disclosure was voluntary.  See Champion Int'l. Corp. v. Int'l. Paper Co., 486 F. Supp. 1328, 1332 (N.D. Ga. 1980) ("'[V]oluntary disclosure, regardless of knowledge of the existence of the privilege, deprives a subsequent claim of privilege based on confidentiality of any significance.'" (citation omitted)); State v. Patterson, 294 P.3d 662, 667 (Utah Ct. App. 2013) (stating that "it is not necessary . . . to show that a [privilege holder] intended to waive the privilege but only that she intended to make the disclosure" (quotation marks and citation omitted)); State v. Gray, 891 So. 2d 1260 (La. 2005) (affirming trial court's ruling that clergy privilege was waived); see also 1 Charles T. McCormick, McCormick on Evidence § 93 (7th ed. 2013) ("Finding waiver in situations in which

11

forfeiture of the privilege was not subjectively intended by the holder is consistent with the view, expressed by some cases and authorities, that the essential function of the privilege is to protect a confidence that, once revealed by any means, leaves the privilege with no legitimate function to perform.").

Finally, unlike the "high standards of proof for the waiver of constitutional rights," Miranda v. Arizona, 384 U.S. 436, 475 (1966), M.R.E. 510(a) does not require that a waiver of privilege be made "knowingly" or "intelligently," see M.R.E. 510(a).  Cf. M.R.E. 305(g) (waiver of right to counsel "must be made freely, knowingly, and intelligently"); Schneckloth v. Bustamonte, 412 U.S. 218, 234, 237 (1973) (holding that "knowledge of a right to refuse [consent] is not a prerequisite of a voluntary consent" and noting that "[a]lmost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial").

The Government nonetheless insists that the present circumstance is not one where it would be "inappropriate to allow the claim of privilege" under M.R.E. 510(a) because AJ and BK were unaware of the privilege when they granted Pastor Ellyson permission to disclose BK's statements.  The effect of

12

this argument, however, is to require a "knowing" and "intelligent" waiver where no such language appears in M.R.E. 510(a).  And where, as here, a privilege holder voluntarily consents to the disclosure of privileged statements to trial counsel without express limitation, we think it would be inappropriate to allow a claim of privilege to prevent Appellant from using those statements at trial.  Cf. R.C.M. 701(a)(6); Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process").

B.

Given that the military judge's ruling was an abuse of discretion, the question remains whether the error implicated Appellant's constitutional rights.  See Collier, 67 M.J. at 352. While "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination," Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986), an accused's Confrontation Clause rights are violated when "'[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination,'" Collier, 67 M.J. at 352 (quoting Van Arsdall, 475 U.S. at 680).  "Whether sufficient

13

cross-examination has been permitted depends on whether the witness's motivation for testifying has already been exposed and 'further inquiry . . . would [be] marginally relevant at best and potentially misleading.'" Id. (quoting United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007)).

There is little question that in cases such as these, the credibility of the putative victim is of paramount importance, and that a statement by that person that she had made up some or all of the allegations to get attention might cause members to have a significantly different view of her credibility.

Here, the military judge's ruling prevented Appellant from using BK's statements to impeach her credibility through cross-examination or otherwise. U.S. Const. amend. VI (right "to be confronted with the witnesses against him"). In addition, the military judge's error prevented Appellant from presenting BK's statements to the panel through Pastor Ellyson's direct testimony, "depriv[ing] [him] of 'relevant and material, and . . . vital' testimony and evidence," United States v. McAllister, 64 M.J. 248, 252 (C.A.A.F. 2007) (quoting Washington v. Texas, 388 U.S. 14, 16 (1967)), and limiting his ability to prove his theory of the case. U.S. Const. amend. V (right to "due process of law"); U.S. Const. amend. VI (right "to have compulsory process for obtaining witnesses in his favor"); see

14

United States v. Jasper, 13-0013/AR

Washington, 388 U.S. at 16-19; McAllister, 64 M.J. at 252.

Given that: (1) BK's testimony was critical to the Government's case; (2) the erroneous exclusion of BK's exculpatory statements prevented Appellant from "expos[ing] the alleged nefarious motivation behind [her] allegations and testimony," see Collier, 67 M.J. at 352; and (3) Appellant's theory of the case was that both his wife, AJ, and his stepdaughter, BK, were lying, the military judge's erroneous ruling violated Appellant's rights to confrontation and due process. See Van Arsdall, 475 U.S. at 680; Washington, 388 U.S. at 19.

C.

"Having found constitutional error, the question remains whether that error was harmless beyond a reasonable doubt." Collier, 67 M.J. at 355 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). "Whether a constitutional error was harmless beyond a reasonable doubt is a question of law reviewed de novo." United States v. Tearman, 72 M.J. 54, 62 (C.A.A.F. 2013). Where the error improperly limits an accused's opportunity to present exculpatory evidence through direct testimony and cross-examination, "[t]he burden is on the Government to show that there is no reasonable possibility that

15

the error contributed to the contested findings of guilty."
Collier, 67 M.J. at 355 (quotation marks and citation omitted).

"To find that the error here warrants relief, we need not conclude that Appellant's defense would have succeeded. Instead the inquiry should focus on whether the military judge's ruling 'essentially deprived Appellant of [her] best defense' that 'may have tipped the credibility balance in Appellant's favor.'" Id. at 356 (quoting United States v. Moss, 63 M.J. 233, 239 (C.A.A.F. 2006)). Where the error violates the accused's right "to be confronted with the witnesses against him," U.S. Const. amend. VI, we apply the balancing test articulated by the Supreme Court in Van Arsdall, and weigh:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

The Government's case and Appellant's defense strategy hinged on BK's credibility. BK's testimony and, as a corollary, her credibility were critical to the Government's case with regard to the indecent conduct specification and the indecent acts specifications as there was no other witness that testified

to seeing the conduct, and no physical evidence supporting her testimony.

Moreover, the Government principally relied on both AJ and BK's testimony to prove the remaining specifications. BK testified that, on Wednesday, August 19, 2009, Appellant texted her sixty-two times, and asked her to send him nude pictures of herself. Using the mirror in her bedroom and her cell phone, BK testified that she took the pictures and sent them to Appellant.

BK next testified that, two days later, Appellant signed her out of school at 1:00 p.m., brought her home, and began to engage in sexual activity with her. BK recalled the details of the sexual activity -- what was done and said -- and stated that it had lasted for about twenty minutes. After the sexual activity ended, BK testified that Appellant photographed her nude body in a variety of poses.

While BK did not testify directly that Appellant deleted the photos from his phone, BK's testimony that Appellant had taken nude photos of her on his cell phone and AJ's testimony that she had seen the photos were offered to prove the necessary factual condition precedent for convicting Appellant of destroying incriminating evidence by deleting the purported

17

photos from his cell phone.[1]  Given that Appellant's defense was that both BK and AJ were lying, and given that no one other than AJ testified to seeing the photos that BK said were taken, and AJ claimed were deleted, we cannot say that BK's testimony was not important to the Government's proof of the obstruction of justice specification.

Appellant was otherwise permitted to cross-examine BK and other Government witnesses to expose inconsistencies in their testimony and in the Government's case, and did so. Nevertheless, we find dispositive the fact that, aside from the circumstantial evidence that it presented, the Government's case rested on both AJ and BK's testimony.  See United States v. Savala, 70 M.J. 70, 78 (C.A.A.F. 2011) (finding that "[t]he strength of the Government's circumstantial case . . . d[id] not overcome" the consideration that "credibility was a critical issue in the case"); Collier, 67 M.J. at 356 ("Because [the witness] was one of only two witnesses on the influencing testimony charge, any additional damage to [her] credibility could have been very significant to the outcome of the case."). While the Government introduced some evidence corroborating some

---

[1] The obstruction of justice specification alleges that Appellant "wrongfully endeavor[ed] to impede an investigation . . . by deleting indecent digital photographic images of his stepdaughter . . . from his cellular telephone."

18

details of AJ and BK's testimony,[2] BK was a critical witness to each charged offense.

In turn, Appellant's defense was that BK and AJ were lying. In support of his theory, Appellant called an employee of a tattoo shop who testified that he did not see "anything out of the ordinary" when BK and Appellant visited the shop only hours after the alleged sexual activity and nude photographing had occurred. Appellant also highlighted the important evidence missing from the Government's case, including (1) the SIM card from BK's cell phone, which had been ruined after being accidentally dropped in the toilet before Criminal Investigation Division (CID) collected the phone approximately one month after the alleged incident had been reported; and (2) any forensic evidence that could have been found either on BK's clothing or the pillows that BK had laid on with Appellant during the sexual

---

[2] AJ testified that, on August 22, 2009, she discovered multiple nude pictures of BK in Appellant's cell phone. She described the different poses in which BK had been photographed and recounted that Appellant had chased her outside the house, grabbed the cell phone, and locked himself in a bedroom while he deleted the photographs. This testimony was partly corroborated by: (1) the transcript of AJ's 911 call, which she made immediately after finding the photographs; (2) the testimony of TJ -- AJ and Appellant's daughter, and BK's half-sister -- who witnessed the altercation, but did not see the photographs in Appellant's cell phone or Appellant deleting them; and (3) a text message that Appellant sent to AJ the day after the alleged altercation, which stated: "I no [sic], but when this mess is over it will all be different, is it fair 2 pay the rest of my life cuz [sic] I made a mistake, I'm only human."

assault that had allegedly occurred prior to Appellant's alleged nude photographing of BK.

The military judge's erroneous ruling prevented defense counsel from introducing evidence that BK had stated in 2007 that she had made up those earlier allegations, which directly supported Appellant's theory of the case. While the Government's case was not weak, it hinged on BK's credibility. The military judge's ruling prevented Appellant from using a critical piece of exculpatory evidence to impeach BK's testimony, which, in turn, could have necessarily impeached AJ's testimony and affected the panel's findings as to each of the remaining specifications. This possibility compels the conclusion that defense counsel's use of BK's exculpatory statement "'may have tipped the credibility balance in Appellant's favor,'" Collier, 67 M.J. at 357 (quoting Moss, 63 M.J. at 239), and its erroneous prohibition was not "unimportant in relation to everything else the jury considered," Id. (citation omitted). See Savala, 70 M.J. at 78 (finding prejudice where "the ruling by the military judge enabled the prosecution to enhance the credibility of its version while handcuffing the defense").

Furthermore, despite knowing of BK's statement that she had made the allegations up, "[a]dding insult to injury, the

Government exploited [the military judge's erroneous] evidentiary limitation . . . in closing argument," Collier, 67 M.J. at 357, arguing that "you can't make [BK's testimony] up," "the kinds of details [that BK recalled] that if you're making something up, just don't come out," and "[i]t went down just the way she explained it." These comments compounded the harm that the military judge's error created.

On these facts, the Government has not carried its burden to show that the deprivation of key evidence directly related to the credibility and motivation of its primary witness was harmless beyond a reasonable doubt.

IV. DECISION

The decision of the United States Army Court of Criminal Appeals is reversed, and the findings and sentence are set aside. The record is returned to the Judge Advocate General of the Army. A rehearing is authorized.