# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**D.C. KING, A.Y. MARKS, B.T. PALMER**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**REESE N. TSO**
**PRIVATE (E-1), U.S. MARINE CORPS**

**NMCCA 201400379**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 9 June 2014.
**Military Judge:** LtCol E. A. Harvey, USMC.
**Convening Authority:** Commanding General, 3d Marine Aircraft Wing, Marine Corps Air Station Miramar, San Diego, CA.
**Staff Judge Advocate's Recommendation:** Col D. K. Margolin, USMC.
**For Appellant:** Maj M. Brian Magee, USMC
**For Appellee:** Maj Suzanne M. Dempsey, USMC; Capt Cory A. Carver, USMC.

29 February 2016

---------------------------------------------------
### OPINION OF THE COURT
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

MARKS, Judge:

A panel of members with enlisted representation, sitting as a general court-martial, found the appellant guilty, contrary to his pleas, of one specification each of wrongful sexual contact, forcible sodomy, and assault consummated by a battery in violation of Articles 120, 125, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, and 928. He was found not guilty of seven additional specifications of violating Article 120, seven additional specifications of violating Article 125, and a single specification of communicating a threat in violation of Article 134, UCMJ. The members sentenced the appellant to three years' confinement, total forfeitures, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant now raises seven assignments of error (AOE).

I. DUE PROCESS REQUIRES DISCLOSURE OF FAVORABLE EVIDENCE TO AN ACCUSED. THE GOVERNMENT AND MILITARY JUDGE FAILED TO DISCLOSE FAVORABLE PORTIONS OF THE COMPLAINING WITNESS'S MENTAL HEALTH RECORDS, INCLUDING TEST RESULTS SHOWING THE WITNESS'S CAPACITY FOR VISUAL MEMORY RANGED FROM AVERAGE TO SEVERELY IMPAIRED. THIS VIOLATED PRIVATE TSO'S RIGHT TO DUE PROCESS.

II. THE SYSTEMATIC EXCLUSION OF INDIVIDUALS BY RANK FROM THE MEMBER SELECTION PROCESS IS PROHIBITED. HERE, THE MILITARY JUDGE DISMISSED THE PANEL FOR VIOLATING ARTICLE 25, UCMJ, AND THE CONVENING AUTHORITY RECONVENED THE SAME PANEL THE SAME DAY. THIS SYSTEMATIC EXCLUSION IS REVERSIBLE ERROR.

III. ONLY AUTHENTICATED EVIDENCE IS ADMISSIBLE UNDER MILITARY RULE OF EVIDENCE 901. HERE, THE GOVERNMENT FAILED TO AUTHENTICATE THE VOICE ON RECORDINGS AND WRITINGS IN A DOCUMENT AS THE APPELLANT'S. THE MILITARY JUDGE ABUSED HIS [SIC] DISCRETION ADMITTING, DESPITE A LACK OF AUTHENTICITY, PROSECUTION EXHIBITS 18, 19, AND 21.

IV. WHEN THE GOVERNMENT CHARGES IN THE ALTERNATIVE BASED ON CONTINGENCIES OF PROOF, THE MILITARY JUDGE MUST DISMISS OR CONSOLIDATE CONVICTIONS. THIS COURT SHOULD DISMISS THE WRONGFUL SEXUAL CONTACT CONVICTION BECAUSE PRIVATE TSO WAS ALSO CONVICTED OF FORCIBLE SODOMY BASED ON CONTINGENCIES OF PROOF.

V. WRONGFUL SEXUAL CONTACT IS NOT A LESSER-INCLUDED OFFENSE OF ABUSIVE SEXUAL CONTACT. HERE, PRIVATE TSO WAS CONVICTED OF THE FORMER AS A LESSER-INCLUDED OF THE LATTER. THIS COURT SHOULD DISMISS HIS CONVICTION FOR WRONGFUL SEXUAL CONTACT.

VI. THE GOVERNMENT MUST PROVE EACH ELEMENT OF AN OFFENSE BEYOND A REASONABLE DOUBT. PRIVATE TSO'S CONVICTION FOR FORCIBLE SODOMY IS LEGALLY AND FACTUALLY INSUFFICIENT BECAUSE THE GOVERNMENT FAILED TO INTRODUCE EVIDENCE TO PROVE THAT PRIVATE TSO'S SODOMY WAS ACCOMPLISHED BY FORCE WITHOUT CONSENT.

VII. WRONGFUL SEXUAL CONTACT IS A SPECIFIC INTENT OFFENSE. WHEN INSTRUCTING THE MEMBERS ON THE INTENT ELEMENT, THE

MILITARY JUDGE TOLD THE MEMBERS TO DISREGARD "MUST BE PROVED BEYOND A REASONABLE DOUBT." THIS WAS REVERSIBLE ERROR. [1]

We find the military judge (MJ) abused her discretion in failing to dismiss the appellant's conviction for wrongful sexual contact and will take corrective action in our decretal paragraph. We find no further error.

## Background

The appellant met SB in a college course in Arizona in January 2009. The two quickly became close friends, spending most of their free time together and beginning a sexual relationship. When the spring 2009 semester ended, they first moved to SB's mother's home, then to the appellant's parents' home in Arizona. The appellant was still a civilian at the time, but he was in the process of enlisting in the Marine Corps. Anticipating the appellant's departure for boot camp, SB moved to her father's home in Minnesota in November 2009.

The appellant did not begin active duty as soon as planned. He remained in Arizona and maintained a long-distance relationship with SB via text messages and the online video chat program, Skype. As there was no commitment between the appellant and herself, SB dated at least one other man in Minnesota. In March 2010, the appellant proposed marriage to SB over Skype, and she accepted. On the same day, the appellant confronted SB with his discovery of messages from this other man in her email account. The appellant's discovery of this infidelity triggered the pattern of abuse alleged in the charges against the appellant. He began to abuse SB emotionally while they were geographically separated and physically and sexually when they were together. SB attempted suicide in April 2010, while still in Minnesota, and again in May 2010, after traveling to be with the appellant in Arizona.

The appellant began his active duty service in the Marine Corps in November 2010. SB continued to visit him in Arizona when he was on leave, and in March 2012, the appellant and SB married. After the wedding, the appellant and SB drove to Camp Pendleton, California, and moved into family housing. On 30 April 2012, an altercation with the appellant prompted SB to flee their home and call 911 for help. Investigation of the domestic disturbance uncovered allegations of sexual abuse and prompted a sexual assault forensic examination. Additional facts necessary for the resolution of the appellant's AOEs are provided *infra*.

## Analysis

### I.    *Member Selection*

Finding a violation of Article 25, UCMJ, the MJ ordered a new convening order on the eve of trial. The CA signed a new order but selected the same members. The appellant argues that the error in the original convening order persisted in the new convening order because the same members were appointed.

---

[1] Appellant's Brief and Assignments of Error of 20 Apr 2015 at 1-2.

CAs must convene courts-martial with members who "are best qualified for the duty by means of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ. However, CAs and their staffs must not use a nominating process that systemically excludes "otherwise qualified potential members based on an impermissible variable such as rank[.]" *United States v. Dowty*, 60 M.J. 163, 171 (C.A.A.F. 2004) (citing *United States v. Kirkland*, 53 M.J. 22, 23 (C.A.A.F. 2000) and *United States v. Daigle*, 1 M.J. 139 (C.M.A. 1975)). The burden is on the defense to establish that the process of nominating court-martial members for a CA's consideration improperly excluded qualified personnel. *Id.* Then, the Government must demonstrate that the exclusions did not materially prejudice the rights of the accused. *United States v. Bartlett*, 66 M.J. 426, 430-31 (C.A.A.F. 2008). We review questions of impermissible systemic exclusion from a court-martial panel *de novo*. *Kirkland*, 53 M.J. at 24. "We review prejudice determinations under a *de novo* standard of review." *United States v. Ward*, 74 M.J. 225, 227 (C.A.A.F. 2015) (citing *United States v. Diaz*, 45 M.J. 494, 496 (C.A.A.F. 1997).

In evaluating prejudice, the Court of Appeals for the Armed Forces (CAAF) has focused on (1) the fairness of the CA's selection of members and (2) the appearance of fairness. *Ward*, 74 M.J. at 228; *Dowty*, 60 M.J. at 175. To determine the fairness of the CA's selection of members, the *Ward* court used the six *Bartlett* factors, asking whether:

(1) the CA enacted or used the instruction with a proper motive;

(2) the CA's motivation in detailing the members he assigned to the court-martial panel was benign;

(3) the CA who referred the "case to trial was a person authorized to convene" the court-martial;

(4) the appellant "was sentenced by court members personally chosen by the convening authority from a pool of eligible" members;

(5) the court members "all met the criteria in Article 25, UCMJ;" and

(6) "the panel was well-balanced across gender, racial, staff, command, and branch lines."

*Ward*, 74 M.J. at 228 (quoting *Bartlett*, 66 M.J. at 431). With regard to the appearance of fairness, the *Ward* court considered whether the evidence left an "unresolved appearance that potentially qualified court members . . . were excluded[.]" *Id.* at 229 (quoting *Kirkland*, 53 M.J. at 25).

Prior to trial, the CA's staff judge advocate (SJA) sent an email to subordinate commands soliciting potential members for the appellant's court-martial and another court-martial scheduled for the following week. The accused in the subsequent court-martial was an E-5. The SJA requested members in pay grades E-6 and above so that all members would be senior enough to sit on both courts-martial. The soliciting email also excluded nominees in ranks O-1

4

and O-2 and all Chief Warrant Officers.[2] On motion by the appellant, the MJ found a violation of the *Kirkland* holding in the systemic exclusion of potential members by rank. To cure this impermissible exclusion of members by rank, the MJ ordered the CA to issue a new convening order.

The following day, the Government submitted amended General Court-Martial Convening Order (GCMCO) #1c-13 and an accompanying explanatory memo from the CA.[3] In his memo, the CA asserted he "did not arbitrarily exclude any rank, group, or class from consideration as members" when selecting the members on GCMCO #1c-13.[4] He considered questionnaires detailing the qualifications of individuals E-3 and above "as well as a roster of the officers attached to Marine Wing Headquarters Squadron-3."[5] The CA understood he could select any member of his command senior to the appellant and was not limited to the nominees presented to him. Ultimately, he based his selection of members on the criteria in Article 25, UCMJ. The CA made no changes to the membership, though, and GCMCO #1c-13 convened the appellant's court-martial with the same members as the order it replaced. Trial defense counsel (TDC) renewed his Article 25 motion, citing an appearance of impropriety in the process. The MJ denied the motion.

Although the appellant does not demonstrate any impermissible exclusion of members among the nominees for GCMCO #1c-13, we will examine the CA's selection process for potential prejudice, including any which might have carried over from the previous convening order. We apply the *Bartlett* factors to ensure that any error perpetuated by selection of the same panel was, in fact, harmless. *Ward*, 74 M.J. at 228.

(1) *Proper motive for exclusionary policy.* There is no indication of an instruction or other formal policy document dictating the original member nomination process in this case. From the SJA's email soliciting members of specific ranks,[6] it appears his primary motives were convenience and clarity. He excluded members E-5 and below so all would be eligible for a subsequent court-martial of an E-5. When presenting nominees for GCMCO #1c-13, the SJA remedied the exclusion by offering junior enlisted questionnaires and the roster of all officers in a command.

(2) *CA's benign motive in detailing members.* The CA refuted any arbitrary exclusion of court-martial member nominees based on rank, group, or class. Although arbitrary is not the opposite of benign, the CA's memo makes clear that he detailed the members in accordance with the Article 25 criteria after considering individuals of all ranks, groups, and classes. His steps to

---

[2] Appellate Exhibit XLIV.

[3] AE XLV.

[4] *Id.*

[5] *Id.*

[6] AE XLIV.

correct previous improper exclusion of certain ranks and his adherence to Article 25 criteria point to his appropriate, and benign, motivation in detailing the panel.

(3) *CA's proper authority.* As the Commanding General of 3d Marine Aircraft Wing, the CA had the authority to convene the general court-martial under Article 22, UCMJ.

(4) *Members personally chosen by the CA from a pool of eligible members.* The CA reviewed the prospective court-martial member questionnaires of all of the members he ultimately detailed and chose them from a pool that included individuals at pay grade E-3 and above and all officers in Marine Wing Headquarters Squadron-3. Guided by the Article 25 criteria, he selected each member for GCMCO #1c-13.

(5) *Members all met the criteria in Article 25, UCMJ.* The CA detailed members to GCMCO #1c-13 based on the Article 25 criteria. Their prospective court-martial member questionnaires[7] and *voir dire* confirmed their qualifications under Article 25, UCMJ.

(6) *Well-balanced panel.* The seven members who sentenced the appellant ranged from pay grade E-6 to O-5 and included a woman.

*Bartlett*, 66 M.J. at 431. From these factors, we conclude that the panel of members who heard the appellant's court-martial was fairly detailed.

We turn then to the appearance of unfairness in detailing the appellant's panel. Specifically, is there any unresolved appearance that potentially qualified members were excluded from a CA's consideration? *Ward*, 74 M.J. at 229 (citing *Kirkland*, 53 M.J. at 25). Despite the CA's decision not to add more junior enlisted or junior officer members to the panel, the actions taken to correct the nomination process and ensure the inclusion of more junior enlisted personnel and officers for his consideration resolve any appearance of exclusion. With that affirmative resolution, we conclude there is no reasonable appearance of unfairness.

We find no prejudice from the prior systemic exclusion of qualified potential members and thus find the MJ did not abuse her discretion in finding that GCMCO #1c-13 did not violate Article 25.

## II. *Authentication of Evidence*

The appellant alleges the MJ admitted Prosecution Exhibits 18, 19, and 21 without sufficient authentication.

When a piece of evidence requires authentication or identification, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it to be." MILITARY RULE OF EVIDENCE 901(a), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Mil. R. Evid. 901(b) provides a non-exhaustive list of examples of authenticating evidence. First among them is "Testimony of a Witness with Knowledge." MIL. R. EVID. 901(b)(1). A witness who can demonstrate the requisite knowledge may authenticate an

---

[7] AE XXXVII.

item of evidence by testifying that it is what it purports to be. *Id.* Another example is "Distinctive Characteristics and the Like." MIL R. EVID. 901(b)(4). The unique "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" may suffice as evidence of the item's identity. *Id.*

To authenticate evidence, a party need only establish a "'prima facie showing that the item is what the proponent claims it to be.'" *United States v. Lubich*, 72 M.J. 170, 174 (C.A.A.F. 2013) (quoting 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 901.02[3]*, at 901-13 to 901-14 (Joseph M. McLaughlin ed., 2d ed. 2003) (footnotes omitted)). Flaws in the authentication should not prevent admission of the item of evidence but should instead go to its weight. *Id.* The party challenging the authenticity of the evidence may cross-examine the witnesses on whose testimony authentication relies. *Id.* at 175.

The Government called two witnesses to testify to the source of PEs 18, 19, and 21. A Naval Criminal Investigative Service (NCIS) special agent testified to his seizure of two cellular telephones, a laptop computer, notes, and a camera from the appellant's barracks room and person. He authenticated the chain of custody form documenting transfer of the evidence to the Defense Computer Forensics Laboratory (DCFL). Then the computer forensic examiner from DCFL who analyzed the appellant's media testified as an expert in that field. Specifically, he testified to discovering PEs 18, 19, and 21 saved on the appellant's computer. TDC had an opportunity to cross-examine both witnesses.

We examine each exhibit and the MJ's decision to admit it in turn.

## A. *PE 18*

PE 18 was purported to be audio recordings of the appellant talking to an unidentified friend as well as recorded audio diary entries. When trial counsel (TC) sought to admit PE 18, TDC responded "[n}o objection."[8] The appellant now argues that the Government failed to call witnesses to authenticate the voice in PE 18, as required by MIL. R. EVID. 901((b)(5) and *United States v. Blanchard*, 48 M.J. 306, 310 (C.A.A.F. 1998). However, "[a] specific waiver of an evidentiary objection extinguishes error . . . ." *United States v. Miles*, 71 M.J. 671, 675 (N.M.Ct.Crim.App. 2012) (in response to a proffer of an expert witness's testimony, trial defense counsel stated they had no objection) (citing *United States v. Olano*, 507 U.S. 725, 733-34 (1993)) (additional citations omitted). Finding specific and affirmative waiver of this evidentiary objection on the part of TDC, we decline to review for error.

## B. *PE 19*

PE 19 was also purported to be audio recordings of the appellant, similar to those in PE 18. However, TDC did object to PE 19. The MJ heard evidence and arguments in an Article 39(a), UCMJ, session and found the evidence of authentication sufficient for the admission of PE 19. TDC maintained his objection. We therefore review the MJ's decision to admit PE 19 for an abuse of discretion. *Lubich*, 72 M.J. at 173. "'An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an

---

[8] Record at 746.

7

erroneous view of the law.'" *Id.* (quoting *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

The MJ concluded there was sufficient evidence of distinctive characteristics to convince her that PE 19 was "what it was purported to be." She cited the Government's proffer of evidence, specifically discussion of "his wife, and Call of Duty, and cheating, the end of the relationship," in announcing her ruling on authentication of PE 19.[9] We find no abuse of discretion in her findings of fact or application of MIL. R. EVID. 901 and the law.

## C. PE 21

PE 21 is purported to be a transcript of a Skype conversation between the appellant and SB. TDC objected to the admission of PE 21 based on a lack of foundation for the evidence and its relevance. Thus, we also review the admission of PE 21 for an abuse of discretion by the MJ.

The MJ admitted PE 21 based on testimony as to its source and evidence that the telephone number depicted was associated with the appellant. The computer forensic examiner could not testify to the telephone number recorded as a party to the Skype conversation in PE 21. But TC offered page 111 from the previously admitted PE 26 as evidence of the connection between the phone number and the appellant. Additionally, the MJ found the content of the conversation transcribed in PE 21 both distinctive and consistent with SB's testimony about the appellant's verbal abuse of her via Skype. We find no abuse of discretion in the MJ's decision to admit PE 21.

## III. Alternatives of Proof and Wrongful Sexual Contact

The appellant and the Government agree that Specifications 5 of Charges I and II were charged as alternatives of proof and that convictions for both necessitate either consolidation of the two charges or dismissal of the lesser charge. *United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014); *United States v. Mayberry*, 72 M.J. 467, 467-68 (C.A.A.F. 2013).[10] Since consolidating violations of two different UCMJ articles is impracticable, *United States v. Thomas*, 74 M.J. 563, 569 (N.M.Ct.Crim.App. 2014), we will order dismissal of the lesser charge, wrongful sexual contact in violation of Article 120, in our decretal paragraph.[11]

## IV. Disclosure of Mental Health Records

The appellant claims violation of his right to due process in the Government's and the MJ's failure to disclose favorable portions of SB's mental health records.

---

[9] Record at 653.

[10] Charge I, Specification 5 and Charge II, Specification 5 alleged that the appellant committed abusive sexual contact and forcible sodomy, respectively, by inserting his penis in SB's mouth on 21 March 2012. Members found the appellant guilty of wrongful sexual contact, which the MJ instructed was a lesser included offense of abusive sexual contact, and forcible sodomy for the oral sex on 21 March 2012.

[11] We need not consider reassessing the sentence, as the members merged the two specifications and charges in reaching their sentence. Dismissal of Charge I, Specification 5 moots AOEs V and VII.

## A. Rules for Courts-Martial 701 and 703 and the Right to Evidence

Suppression of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Article 46, UCMJ, guarantees defense counsel "equal opportunity to obtain witnesses and other evidence[.]" RULES FOR COURTS-MARTIAL 701 AND 703, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) are the mechanisms for enforcing this constitutional and statutory right to discovery and production of exculpatory evidence. *See United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008); *United States v. Mahoney,* 58 M.J. 346, 348 (C.A.A.F. 2003). However, the Military Rules of Evidence (MIL R. EVID.) establish privileges that protect certain evidence from discovery and production.

## B. Mil. R. Evid. 513 and the Psychotherapist-Patient Privilege

MIL. R. EVID. 513 affords any patient the privilege:

> to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist, in a case arising under the [UCMJ], if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

However, a patient waives a privilege if he or she "voluntarily discloses or consents to disclosure of any significant part of the matter or communication under such circumstances that it would be inappropriate to allow the claim of privilege." MIL. R. EVID. 510(a). Waiver of privilege does not require the level of knowledge or intelligence necessary for waiver of constitutional rights. *United States v. Jasper*, 72 M.J. 276, 281 (C.A.A.F. 2013). The CAAF held that "[w]aiver under [MIL. R. EVID.] 510(a) does not require that the privilege holder have knowledge that the waived statements would otherwise be privileged, or of how the waived statements will be used." *Id*. at 278. Once the privilege protecting a communication is voluntarily waived, and the communication is released, the privilege is no longer available to protect that communication. *Id*. at 280.

## C. SB's Mental Health Records

Two sets of SB's mental health records are at issue in this case: (1) a report of psychiatric consultation conducted in a Minnesota hospital on 6 April 2010 following her first suicide attempt (April 2010 records) and (2) a December 2012 report of neuropsychological evaluations conducted in Santa Rosa, California (December 2012 records).[12]

In August 2013, SB signed two releases to allow TC to obtain records of her hospitalization for suicide attempts in April 2010 in Minnesota and May 2010 in Arizona. SB first signed a Department of the Navy Authority to Release Medical Information and Records

---

[12] AE XXXIII.

form.[13]  She requested and authorized "any and all doctors, hospitals, and other institutions having information or records pertaining to any medical or psychiatric examinations or treatment that [she has] received at any time to furnish full and complete information relative thereto to any duly authorized representative of the United States Marine Corps who presents this authorization."[14]  Responding to this release, the Arizona hospital which treated SB after her May 2010 suicide attempt forwarded her records to the TC.  Those records were discovered to TDC, admitted into evidence at trial, and are not at issue.

### 1. April 2010 Records

SB also signed an Authorization for Release of Protected Health Information from the Minnesota hospital where she received treatment after her April 2010 suicide attempt.[15]  She marked that she would like to release "[a]ll pertinent records" for condition or dates of treatment 2009-2012 to the named TC.  Among the records included in such a release were "[c]onsultation reports."  The form acknowledges a signatory's understanding that the release excludes psychotherapy notes, which are not included in patient medical records.  However, the same caveat indicates that medical records include "details of treatment for mental health . . . ."  SB made no marks or notes restricting the scope of her release.

The TC received the April 2010 records from the Minnesota hospital in September 2013.  However, upon seeing notes of the psychiatric consultation conducted after SB's suicide attempt, the TC "immediately stopped reading, placed all records received in an envelope, and sealed the envelope"[16] to comply with MIL. R. EVID. 513.  He advised SB to seek the advice of a Victim's Legal Counsel (VLC), and she did.  The VLC announced SB's invocation of her "privilege to refuse to disclose the contents of the [April 2010] medical records" on 28 March 2014.[17]  Shortly thereafter, TC submitted his Provision of Discovery memo to TDC, notifying them of his receipt and disgorgement of the April 2010 records and SB's claim of psychotherapist-patient privilege.  The memo referred to SB's signed authorization to release protected health information.

In response to this disclosure, TDC filed a Motion to Compel Discovery of any and all of SB's mental health records.  TDC never raised the issue of waiver but relied on MIL. R. EVID. 513(d)(8), the exception to the psychotherapist-patient privilege that applies "'when admission or disclosure of a communication is constitutionally required.'"[18]  TDC requested the Government provide SB's April 2010 mental health records to the MJ for *in camera* review.[19]  At oral argument, both the TC and VLC agreed the April 2010 records were potentially relevant and

---

[13] PE 26 at 6.

[14] *Id.*

[15] AE XXXIII.

[16] AE XXII at 2.

[17] AE XXI at 7.

[18] *Id*. at 5.

[19] *Id.*

subject to *in camera* review. The MJ reviewed the April 2010 records *in camera* but concluded they contained nothing constitutionally required for due process and denied their discovery to TDC.

In her written ruling, the MJ concluded that SB invoked her psychotherapist-patient privilege and the Government received the April 2010 records inadvertently. But the MJ reached no findings of fact as to the waivers SB signed. Her conclusions of law were silent as to whether the psychotherapist-patient privilege still protected the records. Instead, she concluded that the records contained none of the evidence TDC sought.[20]

We review an MJ's decision to disclose or withhold psychotherapist-patient records reviewed *in camera* for an abuse of discretion. *United States v. Klemick*, 65 M.J. 576, 580-81 (N.M.Ct.Crim.App. 2006); *see also Jasper*, 72 M.J. at 280.

Assuming, without deciding, that the MJ abused her discretion, we must determine "whether the error implicated Appellant's constitutional rights." *Jasper*, 72 M.J. at 281 (citing *United States v. Collier*, 67 M.J. 347, 352 (C.A.A.F. 2009). "The question is whether '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.'" *Collier*, 67 M.J. at 352 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). Should we find that the admission of the April 2010 records might have given the members "a significantly different impression of [SB's] credibility," there is constitutional error. *Id*.

If there is constitutional error, it is reversible unless harmless beyond a reasonable doubt. *Collier*, 67 M.J. at 355. If error is non-constitutional, it is reversible only if it has "'substantial influence' on the findings." *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

The April 2010 psychiatric consultation notes contain SB's report of her medical and mental health history, her explanation of what prompted her suicide attempt, and the psychiatrist's observations of her state of mind and maturity.

*2. December 2012 Records*

During the same motions hearing, TDC also argued for records from mental health counseling SB received after she complained of appellant's abuse in April 2012. TDC cited SB's testimony at the Article 32, UCMJ, hearing that she received counseling and an NCIS report naming the counselor. TDC sought production of post-complaint counseling records for *in camera* review to determine if SB identified alternate sources of any relevant pain and suffering or simply neglected to mention the alleged abuse at all.

The parties discussed whether the Government had possession of any post-complaint mental health records at length at the motions hearing. TC and VLC unequivocally denied ever

---

[20] AE CI at 5.

seeing or possessing any mental health records other than the April 2010 records. The MJ ruled that TDC failed to provide any evidence of the relevance or necessity of post-complaint counseling records, and she declined to order their production.[21]

After the MJ issued her MIL. R. EVID. 513 ruling on 2 June 2014, TDC asked her to clarify which records she reviewed *in camera*. The MJ replied that she reviewed only records of SB's April 2010 hospitalization. Nearly three months later, after trial, the MJ signed a court order resealing Appellate Exhibit XXXIII, identified as mental health records reviewed *in camera* under MIL. R. EVID. 513. When the record of trial was docketed for appellate review, AE XXXIII contained a December 2012 report of a neuropsychological evaluation SB received. Therefore, December 2012 records of psychological evaluations of SB were necessarily in the Government's possession, custody, and control when AE XXXIII was last sealed. The record of trial yields no clues as to how or when these December 2012 records came into the Government's custody.

Government failure to disclose evidence that defense counsel might find helpful in cross-examining an adverse witness implicates the constitutional right to due process identified in *Brady, supra*. *United States v. Bagley*, 473 U.S. 667, 676 (1985). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id*. at 678.

The December 2012 report detailed the findings of a neuropsychologist in Santa Rosa, California, who conducted a battery of tests on SB. The findings revealed her possible impairment in four cognitive areas: visual immediate and delayed memory, attention/concentration, executive functioning, and visual spatial/constructional abilities.

While we could order further fact-finding regarding the December 2012 records, we need not do so. As discussed *infra*, we are convinced that the withheld evidence, to include the April 2010 and December 2012 records, would not have changed the outcome of the case. *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999); *United States v. Meadows*, 42 M.J. 132, 138 (C.A.A.F. 1995).

*D. Evaluation of Error*

Assuming, without deciding, that the MJ abused her discretion by withholding the April 2010 records, we must determine whether any error significantly affected the members' impression of SB's credibility and, ultimately, the findings. *Collier*, 67 M.J. at 355; *Walker*, 57 M.J. at 178. Assuming, without deciding, that the Government failed to disclose requested mental health records in its custody, we must determine if the suppression of the December 2012 records "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. We begin with an assessment of SB's credibility in order to evaluate the impact of omitted evidence on the outcome of the trial.

---

[21] The appellant does not claim the MJ erred in her ruling, thus we will not review it. The ruling is relevant to the factual background. TDC requested 2012 mental health records. The Government asserted it did not possess any 2012 mental health records, and the MJ did not order the Government to produce any.

Careful review of SB's testimony, particularly on cross-examination, reveals that the April 2010 records would have had little to no impact on the members' determination of her credibility. SB's testimony bore out most of the details shared with and observations made by the psychiatrist in April 2010. During cross-examination, TDC impeached SB's credibility with her prior NCIS statement and her Article 32 testimony, rendering any value from the records largely cumulative. Finally, we note that the members acquitted the appellant of all charges and specifications relying on SB's testimony alone. Thus the MJ's decision to withhold the April 2010 records is not constitutional error. *Jasper*, 72 M.J. at 281.

We now look beyond SB's testimony and evaluate the impact of the April 2010 and December 2012 records on the appellant's two convictions.

### 1. *Forcible Sodomy on 21 March 2012*

The appellant was convicted of placing his penis in SB's mouth, by force and without her consent. His video recording of the encounter provides visible and audible proof of his use of physical force against SB during oral sex and SB's lack of consent.[22] The court-martial members' ability to watch and hear the incident essentially rendered SB's testimony, and thus her credibility on this issue, far less dispositive.

When SB did not perform fellatio to the appellant's satisfaction, he said, "I'm going to force your head down, okay."[23] She whimpered "no." Her mouth was already around his penis, but his hand was now on the back of her head. With his hand holding the back of her head, he began to thrust inside her mouth. SB began to gag, and her face flushed. She slapped him repeatedly, signaling her distress and lack of consent. He continued to hold her head in place before releasing her. As soon as he released SB, she removed her mouth from his penis. She then tearfully begged, "please, no more, no more."[24]

In light of this video recording, which does not rely on SB's credibility or testimonial capacity, we find that the April 2010 records would not have had "'substantial impact' on the findings." *Walker*, 57 M.J. at 178 (quoting *Kotteakos*, 328 U.S. at 765). Furthermore, and for the same reasons, omission of the December 2012 records does not undermine our confidence in the members' findings of guilty to this charge and specification. *Bagley*, 473 U.S. at 678.

### 2. *Assault Consummated by Battery on 30 April 2012*

SB's testimonial capacity is more central to the appellant's conviction for assault consummated by battery. She testified that on 30 April 2012, the appellant wrapped both his hands around her neck during an argument. When asked if he were forceful with his hands on her neck, she replied, "Very. They were very strongly gripped on my throat, squeezing very

---

[22] PE 15.

[23] *Id.* at disc 2.

[24] *Id.*

13

hard."[25] She stated she was unable to breathe while his hands were on her neck. As soon as she was able, she retrieved her cell phone, fled the residence, and called 911.

Two witnesses testified to observing external and/or internal evidence on SB consistent with choking or strangulation. The investigator who reported to the residence on 30 April 2012 testified to noticing redness on SB's neck. The next morning, SB received a sexual assault forensic evidence exam. During the exam, the nurse examiner observed and recorded several findings consistent with choking or strangulation: broken blood vessels, or petechiae, in three areas in the back of SB's mouth and throat, redness in her throat, and redness on her neck that indicated friction and probably indicated bruising underneath. The nurse examiner testified that the internal injuries could indicate choking or strangulation.

The observations of neutral witnesses within minutes and hours of the alleged assault, coupled with the physical evidence of her injuries, corroborate SB's testimony. In light of this corroboration, we find that the April 2010 records would not have had "'substantial impact' on the findings." *Walker*, 57 M.J. at 178 (quoting *Kotteakos*, 328 U.S. at 765). Nor does the omission of the December 2012 records undermine our confidence in the members' findings of guilty to this charge and specification. *Bagley*, 473 U.S. at 678.

## V. *Factual Sufficiency*

We review issues of factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are ourselves "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

The appellant argues that SB's testimony as to her willingness to engage in anal and oral sex, even to the point of vomiting, precludes a conviction for forcible sodomy. SB repeatedly expressed her willingness to do anything to make the appellant happy. Such clear professions of willingness would seemingly prove that the sexual encounters were consensual. But that requires removing the statements from their context. The video of the couple's sexual encounter of 21 March 2012 clearly depicts that context.[26] As discussed *supra*, the evidence of forcible sodomy on 21 March 2012 convinces us of appellant's guilt beyond a reasonable doubt.

---

[25] Record at 399.

[26] PE 15 at disc 2.

## Conclusion

The findings of guilty to the lesser included offense in Charge I, Specification 5 and Charge I are set aside and dismissed.  The remaining findings and the sentence are affirmed.

Senior Judge KING and Judge PALMER concur.

For the Court



R.H. TROIDL
Clerk of Court